AMERICAN PETROLEUM
INSTITUTE, Petitioner,

v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, Respondent,

Hazardous Waste Treatment Council,
Steel Manufacturers' Association [Formerly Steel Bar Mills & National Steel
Producers Association], Intervenors.

AMERICAN PETROLEUM
INSTITUTE, Petitioner,

v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, Respondent,

Hazardous Waste Treatment
Council, Intervenor.

HORSEHEAD RESOURCE DEVELOPMENT COMPANY, INC., Petitioner,

v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, Respondent,

Hazardous Waste Treatment Council,
American Mining Congress,
Intervenors.

NATIONAL ASSOCIATION OF METAL
FINISHERS, Petitioner,

v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, Respondent,

Hazardous Waste Treatment Council,
American Iron and Steel Institute,
Intervenors.

NATURAL RESOURCES DEFENSE
COUNCIL, INC., Petitioner,

v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, and Lee
Thomas, Administrator, Respondents,

American Iron and Steel Institute, American Mining Congress, The Dow Chemical Company, Mobil Oil Corporation,
The Fertilizer Institute, American Petroleum Institute, Intervenors.

CHEMICAL WASTE MANAGEMENT,
INC., Petitioner,

v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, Respondent,

Hazardous Waste Treatment Council, The
International Metals Reclamation Company, Inc., American Mining Congress,
Intervenors.

HAZARDOUS WASTE TREATMENT
COUNCIL, Petitioner,

v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, Respondent,

Chemical Manufacturers Association,
American Petroleum Institute, The
Fertilizer Institute, Intervenors.

CHEMICAL MANUFACTURERS
ASSOCIATION, Petitioner,

v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, Respondent,

Hazardous Waste Treatment
Council, Intervenor.

NATIONAL SOLID WASTE MANAGEMENT ASSOCIATION, INC., and
Waste Management of North America,
Inc., Petitioners,

v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, Lee M.
Thomas, Administrator, Respondents,

Hazardous Waste Treatment
Council, Intervenor.

AMERICAN IRON AND STEEL
INSTITUTE, Petitioner,

v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, Respondent.

AMERICAN IRON AND STEEL
INSTITUTE, Petitioner,

v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, Respondent.

CHEMICAL MANUFACTURERS
ASSOCIATION, Petitioner,

v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, Respondent.

**730**

MONSANTO COMPANY, Petitioner,

v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, Respondent.

The DOW CHEMICAL
COMPANY, Petitioner,

v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, Respondent.

AMERICAN MINING
CONGRESS, Petitioner,

v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, Respondent.

ROSS INCINERATION SERVICES,
INC., Petitioner,

v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, Respondent,

American Iron and Steel
Institute, Intervenor.

Nos. 88–1606, 88–1654, 88–1763, 88–1781,
88–1801, 89–1053 to 89–1059 and
89–1061 to 89–1064.

United States Court of Appeals,
District of Columbia Circuit.

Argued April 20, 1990.

Decided June 26, 1990.

Ralph J. Colleli, Jr., with whom G. William Frick, James K. Jackson, for American Petroleum Institute; Karl S. Bourdeau, Steven F. Hirsch and Barton C. Green, for American Iron and Steel Institute; John T. Smith, II, for Chemical Mfrs. Ass'n and National Ass'n of Metal Finishers were on the joint brief, for Industry petitioners in Nos. 88–1606, 88–1654, 88–1781, 89–1055, 89–1057, 89–1058, 89–1059. Thomas S. Llewellyn and James K. Jackson also entered appearances for American Petroleum Institute.

David R. Case, with whom Jane L. Bloom, Donald S. Strait and Jacqueline M. Warren, for Natural Resources Defense Council; J. Brian Molloy and Douglas H. Green, for Chemical Waste Management, Inc., were on the joint brief for petitioners, Natural Resources Defense Council, et al., in Nos. 88–1801, 89–1053, 89–1054. Joan Z. Bernstein also entered an appearance, for Chemical Waste Management, Inc.

David F. Zoll, Ronald A. Shipley and John T. Smith, II, for Chemical Mfrs. Ass'n; David R. Case, for Hazardous Waste Treatment Council were on the joint brief, for petitioners, The Chemical Mfrs. Ass'n, et al., in No. 89–1059.

Jeffrey O. Cerar and Ellen R. Hornstein entered appearances, for petitioner, Horsehead Resource Development Co., Inc., in No. 88–1763.

Angus MacBeth and Samuel I. Gutter entered appearances, for petitioners, National Solid Waste Management Ass'n, Inc. and Waste Management of North America, Inc., in No. 89–1056.

John T. Smith, II, also entered an appearance for petitioner, Monsanto Company in No. 89–1061.

Karl S. Bourdeau also entered an appearance, for petitioner, The Dow Chemical Co., in No. 89–1062.

John N. Hanson and Edward M. Green entered appearances, for petitioner, American Min. Congress, in No. 89–1063.

Richard D. Panza and Thomas A. Downie entered an appearance, for petitioner, Ross Incineration Services, Inc., in No. 89–1064.

Daniel S. Goodman, Atty., U.S. Dept. of Justice, and Steven E. Silverman, Atty., U.S. E.P.A., with whom Richard B. Stewart, Asst. Atty. Gen., Michael A. McCord, Atty., U.S. Dept. of Justice, and E. Donald Elliott, Gen. Counsel, U.S. E.P.A., were on the joint brief, for respondents in all cases. Lisa F. Ryan, Thomas R. Bartman and Roger J. Marzulla, Attys., U.S. Dept. of Justice, also entered appearances, for respondents.

Jeffrey O. Cerar, with whom John Moore, for Zinc Corp. of America and

Horsehead Resources Development Co.; John N. Hanson, Donald J. Patterson, Jr., Edward M. Green and Roderick T. Dwyer, for American Min. Congress; Karl S. Bourdeau, Steven F. Hirsch and Barton C. Green, for American Iron and Steel Institute; John T. Smith, II, for Chemical Mfrs. Ass'n; Richard A. Flye and Gordon D. Quin, for The Fertilizer Institute; Neil J. King, for The Intern. Metals Reclamation Co., Inc., John L. Wittenborn and William Guerry, for Steel Mfrs' Ass'n, were on the joint brief, for Industry intervenors in Nos. 88–1606, 88–1763, 88–1781, 88–1801, 89–1053, 89–1054 and 89–1064. Gary H. Baise also entered an appearance, for American Iron and Steel Institute.

David R. Case was also on the brief, for intervenor, Hazardous Waste Treatment Council, in Nos. 88–1606, 88–1654, 88–1763, 88–1781, 89–1053, 89–1055 and 89–1056.

Harold Himmelman and Karl S. Bourdeau also entered appearances, for intervenor, Mobil Oil Corp., in No. 88–1801.

G. William Frick, James K. Jackson and Ralph J. Colleli, Jr., also entered appearances, for intervenor, American Petroleum Institute, in Nos. 88–1801 and 89–1054.

Before WALD, Chief Judge, and EDWARDS and RUTH BADER GINSBURG, Circuit Judges.

Opinion for the Court filed PER CURIAM.

PER CURIAM:

These consolidated petitions for review challenge various aspects of a final Environmental Protection Agency ("EPA" or "agency") rule promulgated under the authority of the Resource Conservation and Recovery Act of 1976 ("RCRA") § 3004, 42 U.S.C. § 6924. The rule sets out land disposal prohibitions and treatment standards for "First–Third" scheduled wastes ("First–Third Rule"), 53 Fed.Reg. 31,138 (Aug. 17 1988).[1]

The American Petroleum Institute, the American Iron and Steel Institute, the Chemical Manufacturers Association and the National Association of Metal Finishers (collectively "Industry Petitioners") challenge EPA's conclusion that the RCRA precludes the agency from considering land treatment, in conjunction with pretreatment, as an authorized method of treating hazardous wastes. Industry Petitioners also challenge EPA's abandonment of comparative risk analysis as a means of determining authorized treatment standards for hazardous wastes, claiming that the agency did not provide adequate reasons for abandoning this type of risk assessment.

The Natural Resources Defense Council, Chemical Waste Management, Inc. and the Hazardous Waste Treatment Council (collectively "NRDC") challenge the part of the First–Third Rule that establishes treatment standards for K061 hazardous waste. NRDC claims that EPA has unlawfully exempted the slag residues that result from the "treatment" of K061 in zinc smelters from the RCRA's restrictions on land disposal of hazardous wastes.

We agree with EPA that the RCRA does preclude land treatment in conjunction with pretreatment as a method of treating hazardous wastes. Additionally, we find that EPA provided adequate reasons for abandoning comparative risk analysis. However, because we find that EPA unlawfully exempted the residue produced from smelting K061 waste from the RCRA's restrictions on land disposal of hazardous wastes, we vacate that portion of the rule and remand to the agency for further rulemaking consistent with this opinion.

## I. BACKGROUND

### A. *Overview*

Subtitle C of the RCRA establishes "a 'cradle to grave' regulatory structure overseeing the safe treatment, storage and disposal of hazardous waste." *United Tech-*

---

1. 42 U.S.C. § 6924(g) required EPA to promulgate final regulations governing the disposal of all scheduled hazardous wastes. Section 6924(g)(4) required EPA to promulgate a schedule dividing such wastes into "thirds." In 1986,

EPA established a three-part schedule for setting treatment standards for the § 6924(g) hazardous wastes. 51 Fed.Reg. 19,300 (May 28, 1986). Land disposal restrictions for First–Third scheduled wastes took effect on August 8, 1988.

*nologies Corp. v. EPA,* 821 F.2d 714, 716 (D.C.Cir.1987). Section 3001 of the RCRA, 42 U.S.C. § 6921, directs EPA to promulgate criteria for identifying the characteristics of hazardous waste, and for listing hazardous waste. In accordance with this directive, EPA has adopted a two-part definition of hazardous waste.

First, EPA has published several lists of specific hazardous wastes ("listed wastes") in which EPA has described the wastes and assigned a "waste code" to each one. 40 C.F.R. § 261, Subpart D. Second, EPA has identified four characteristics of hazardous wastes: ignitability, corrosivity, reactivity and extraction procedure toxicity. *See* 40 C.F.R. § 261.20–.24. Any solid waste exhibiting one or more of these characteristics is automatically deemed a "hazardous waste" subject to regulation under Subtitle C of the RCRA even if it is not a "listed" waste. *See Hazardous Waste Treatment Council v. EPA,* 861 F.2d 270, 271 (D.C. Cir.1988).

Once a waste is listed or identified as hazardous, its subsequent management is regulated. Treatment, storage and disposal of a hazardous waste normally can be undertaken only pursuant to a permit that specifies the conditions under which the waste will be managed. 42 U.S.C. §§ 6922–6925.

In the 1984 amendments to the RCRA, Congress shifted the focus of hazardous waste management away from land disposal to treatment alternatives, determining that:

> [C]ertain classes of land disposal facilities are not capable of assuring long-term containment of certain hazardous wastes, and to avoid substantial risk to human health and the environment, reliance on land disposal should be minimized or eliminated.... [L]and disposal ... should be the least favored method for managing hazardous wastes.

42 U.S.C. § 6901(b)(7). Consistent with this finding, Subtitle C of the RCRA now prohibits hazardous wastes from being dis-

posed of on the land unless one of two conditions is satisfied: (1) the Administrator of EPA determines, "to a reasonable degree of certainty, that there will be no migration of hazardous constituents from the disposal unit or injection zone for as long as the wastes remain hazardous." 42 U.S.C. § 6924(d), (e), (g), (m); or (2) the waste is treated to meet standards established by EPA pursuant to 42 U.S.C. § 6924(m). Section 6924(m)(1), which sets forth treatment requirements, provides:

> the Administrator shall, after notice and opportunity for hearings ..., promulgate regulations specifying those levels or methods of treatment, if any, which substantially diminish the toxicity of the waste or substantially reduce the likelihood of migration of hazardous constituents from the waste so that short-term and long-term threats to human health and the environment are minimized.

42 U.S.C. § 6924(m)(1).

To satisfy this directive, EPA required that the hazardous wastes subject to the standards be treated to levels that are achievable by performance of the best demonstrated available technology ("BDAT") or be treated by methods that constitute BDAT. *See* 51 Fed.Reg. 40,572, 40,578 (Nov. 7, 1986). EPA also explained that in setting BDATs it would compare the risk of various treatments for a particular waste with the risk of land disposal of that waste ("comparative risk" assessment).

### B. *EPA's First–Third Rule*

#### 1. Land Treatment

EPA's First–Third Rule established BDATs for the petroleum refining wastes with the waste codes K048–K052, as set forth in 40 C.F.R. §§ 268.41.[2] The standards chosen by EPA are based on incineration and solvent extraction technology. 53 Fed.Reg. 31,159–60 (Aug. 17, 1988).

Notwithstanding the requests of Industry Petitioners, the agency refused to con-

---

**2.** Petroleum refining wastes K048–K052 are listed, respectively, as dissolved air flotation float, slop oil emulsion solids, heat exchanger bundle cleaning sludge, API separator sludge and tank bottoms. *See* 40 C.F.R. § 261.32.

sider land treatment (in conjunction with certain forms of pretreatment) as a potential BDAT for petroleum wastes. In responses to comments advocating such treatment, the agency explained that "Congress had specifically voided the consideration of land treatment as BDAT by defining it to be land disposal in [§ 6924(k)] as amended.... Land treatment is a type of land disposal, and prohibited wastes must meet a treatment standard *before* they are land disposed, unless they are disposed in no-migration units." Response to Comments Related to the First–Third Wastes Treatment Technologies and Associated Performance, vol. V, Doc. No. LDR7–S001E, p. 01621 (emphasis added); vol. VI, Doc. No. LDR9–S001F, pp. 01755, 01758.

### 2. K061 Hazardous Waste

The final First–Third Rule also established BDATs for K061, a zinc-bearing listed hazardous waste that emanates from the primary production of steel in electric furnaces. 40 C.F.R. § 261.32. The rule established separate treatment standards for two subcategories of K061: a high zinc subcategory (K061 that is at least 15% zinc in composition) and a low zinc subcategory (K061 that is less than 15% zinc in composition). Only the treatment standard for the high zinc subcategory is at issue in this case.

EPA determined that high temperature metals recovery was the BDAT for treating high zinc K061 hazardous wastes. It selected this treatment method on the ground that mandatory recycling of recoverable metals would reduce the amount of hazardous wastes ultimately treated and disposed. 53 Fed.Reg. 31,162 (1988).

Nonetheless, EPA determined that it lacked authority to establish any treatment standards for the slag residue that results from the metals reclamation process. As the agency explained in the notice of pro-

posed rulemaking, the furnaces used for metals reclamation "are normally ... essential components of the industrial process, and when they are actually burning secondary materials for material recovery[,] [they] can be involved in the very act of production, an activity normally beyond the Agency's RCRA authority." 53 Fed. Reg. 11,753 (1988). Consequently, EPA felt constrained to view K061 as no longer being "waste" within the meaning of the RCRA once the K061 enters a reclamation furnace. *See id.* In the preambles to the final rule, EPA related this analysis to the agency's so-called "indigenous principle," under which EPA disclaims the power to regulate any material generated by the same type of furnace in which the material is being reclaimed. *See* 53 Fed.Reg. 31,-162.

### 3. Comparative Risk

In addition to establishing BDATs for various hazardous wastes, the First–Third Rule discussed certain general principles that the agency would follow in establishing treatment standards. As part of this discussion, EPA stated that it would no longer compare the risks of treatment technologies with the risks of land disposal in determining treatment technologies. 53 Fed.Reg. 31,190–91 (Aug. 17, 1988). EPA found that such assessments had been of negligible benefit to the agency in previous rulemakings and concluded that the continued use of the assessments would have no influence on the treatment standards chosen under the First–Third Rule and subsequent rulemakings and could lead to environmentally counterproductive results. *Id.*

## II. ANALYSIS [3]

### A. *Land Treatment*

Prior to the final First–Third rulemaking, Industry Petitioners asked EPA to consider

---

**3.** On April 19, 1990, the day before oral argument, the parties filed an Unopposed Emergency Joint Motion to Defer Argument on the "Use Constituting Disposal" Rule. That motion, which was granted by the court, covered petitioners' challenge to EPA's exemption of hazardous secondary materials used in a manner con-

stituting disposal from the regulations otherwise applicable to recycled wastes. The explanation for the parties' request was that settlement negotiations had resulted in an agreement in principle on the issue. Consequently, we do not address the legality of the Use Constituting Disposal Rule in this opinion.

land treatment in conjunction with pretreatment as a BDAT for K048–K052, which are "listed" hazardous wastes that emerge from the petroleum refining process.[4] *See* 40 C.F.R. § 261.32. While EPA made no mention of these comments in either the proposed or final rule on First–Third wastes, the agency responded to them in a document entitled "Response to Comments Related to the First–Third Wastes Treatment Technologies and Associated Performance" ("Response to Comments"). EPA explained that the RCRA precluded the agency from considering land treatment methods as BDATs because "[l]and treatment is a type of land disposal, and prohibited wastes must meet a treatment standard before they are land disposed, unless they are disposed in no-migration units.... Congress has *specifically* voided the consideration of land treatment as BDAT by defining it to be land disposal in § [6924(k)] of RCRA as amended." [5] Response to Comments, vol. V, Doc. No. LDR7–S001E, p. 01621 (emphasis added); vol. VI, Doc. No. LDR9–S001F, pp. 01755, 01758.

■ Industry Petitioners take issue with EPA's finding that the RCRA precludes consideration of land treatment as a BDAT. They maintain that the RCRA permits EPA to consider land treatment and that we must vacate the portion of the agency's rule that established BDATs for petroleum wastes because the agency misinterpreted the RCRA in determining those BDATs. *See Securities and Exchange Commission v. Chenery Co.*, 318 U.S. 80, 95, 63 S.Ct. 454, 462, 87 L.Ed. 626 (1943) ("[A]n administrative order cannot be upheld unless the grounds upon which the agency acted in exercising its powers were those upon which its action can be sustained."). *See also International Brotherhood of Electrical Workers, Local Union No. 474 v. NLRB (St. Francis Hospital)*, 814 F.2d 697, 708 (D.C.Cir.1987) ("[w]hen [an agency] bases a decision on a standard it unjustifiably believes was mandated by Congress, [its] decision must not be enforced, even though [it] might be able to adopt the very same standard in the exercise of its discretion"). We find, however, that EPA properly interpreted the RCRA as precluding consideration of land treatment.

Section 6924(k) of the RCRA specifically includes the placement of hazardous waste in a "land treatment facility" within its definition of land disposal. *See* n. 5 *supra.* Consequently, land treatment is subject to all of the statutory restrictions applicable to land disposal generally. In simple terms, land treatment is a form of land disposal involving the placement of hazardous waste directly on the ground (rather than, for example, in a landfill or surface impoundment) with the expectation that the hazardous constituents will eventually become less hazardous.[6] Thus, in a "land treatment facility," the treatment of hazardous wastes occurs only *after* the waste has been land disposed.

The RCRA clearly specifies, however, that hazardous wastes must be treated *before* being land disposed. Unless a waste is disposed of in a unit demonstrated to meet the "no migration" test of 42 U.S.C.

---

**4.** *See, e.g.,* Comment from Sun Oil to EPA, May 20, 1988, Joint Appendix ("J.A.") at 000309–11, which reads in relevant part:

> The Sun Oil Company submits these comments on the proposed rule for land disposal restrictions.... The API submitted a report entitled Evaluation of Treatment Technologies for Listed Petroleum Refinery Wastes. This report provided information on pretreatment technologies, *i.e.* (filters and dryers) generally used in refinery operations. The report also provided data on solvent extraction.... It is Sun's opinion that these technologies combined with either land treatment or land disposal adequately protect human health and the environment....

**5.** 42 U.S.C. § 6924(k) provides in relevant part that:

> [t]he term "land disposal" [ ] ... shall be deemed to include but not be limited to, any placement of such hazardous waste in a ... land treatment facility.

**6.** EPA has described the land treatment of hazardous waste as:

> the application of waste on the soil surface or the incorporation of waste into the upper layers of the soil ... in order to degrade, transform, or immobilize hazardous constituents present in the waste. As such, land treatment is both a treatment and a disposal operation. 51 Fed.Reg. 1,602, 1,702 (Jan. 14, 1986) (proposed "solvents and dioxins" rule).

§§ 6924(g)(5) and (d)(1),[7] the waste may not be land disposed unless the waste *"has complied* with the pretreatment regulations promulgated under" § 3004(m) of the RCRA. 42 U.S.C. § 6924(g)(5) (emphasis added).

Sections 6924(m)(1) and (2) are equally explicit. In pertinent part they provide that when a

> [H]azardous waste *has been treated* [in a manner] which substantially diminish[es] the toxicity of the waste or substantially reduce[s] the likelihood of migration of hazardous constituents from the waste so that the short-term and long-term threats to human health and the environment are minimized ...[,] such waste or residue thereof ... may be disposed of in a land disposal facility which meets the requirements of this subchapter.

(Emphasis added.) These provisions are unambiguous: treatment, *i.e.,* a BDAT, must substantially diminish the toxicity of a waste or substantially reduce the likelihood of the migration of its hazardous constituents *prior* to land disposal.

While there is one instance in which Congress allowed hazardous wastes to be treated in nonprotective land disposal units without first being treated to meet the § 6924(m) treatment standards, this is the exception that proves the rule. Pursuant to 42 U.S.C. § 6925(j)(11), Congress allowed surface impoundments (a type of land disposal unit under § 6924(k)) to receive, on an interim basis, hazardous wastes that have not been treated to meet § 6924(m) standards. Such surface impoundments must, however, meet certain "minimum technological requirements" specified in

§ 6924(*o* )(1), including double liners and leachate collection systems. 42 U.S.C. § 6925(j)(11)(A). Moreover, the hazardous treatment residues from such surface impoundments must be removed for subsequent management within a year after the hazardous waste has been placed in the impoundment. 42 U.S.C. § 6925(j)(11)(B).

If Industry Petitioners' interpretation of § 6924(m) were correct, § 6925(j)(11) would be surplusage since EPA would already have been authorized to permit the treatment of hazardous wastes *subsequent* to land disposal. Moreover, § 6925(j)(11) shows that when Congress intended to allow the land disposal of untreated hazardous wastes in units not meeting the "no migration" standard, it did so explicitly and placed numerous restrictions upon such disposal.

In sum, then, because we find no indication in the record that the pretreatment component of the BDAT that Industry Petitioners asked EPA to consider—land treatment in conjunction with some form of pretreatment—would *by itself* meet the strictures of § 6924(m), we find that EPA was correct in concluding that the BDAT suggested by Industry Petitioners was precluded from consideration by § 6924(m).

Of course, if Industry Petitioners had asserted that the pretreatment they were contemplating in conjunction with land treatment *by itself* met either the "substantially diminish" or "substantially reduce" requirement of § 6924(m), we would agree that EPA erred in concluding that the RCRA precluded consideration of the recommended BDAT.[8]

---

7. The "no migration test" operates as follows. Where the Administrator determines that a method of land disposal of a hazardous waste "will be protective of human health and the environment for as long as the waste remains hazardous," § 6924(g)(5), the RCRA allows land disposal of the waste pursuant to that method. The Administrator may not determine a method of land disposal of a hazardous waste to be protective of health and the environment unless:

> it has been demonstrated to the Administrator, to a reasonable degree of certainty, that there will be *no migration* of hazardous constituents from the disposal unit ... for as long as the waste remains hazardous.

42 U.S.C. § 6924(d)(1) (emphasis added). The "no migration" provision is not in issue here, however, because Industry Petitioners do not argue that the BDAT they are requesting meets the "no migration" test.

8. Unlike Industry Petitioners, however, we would not interpret § 6924(m) as giving EPA the *discretion* to allow land treatment, *i.e.,* land disposal, of wastes that have been pretreated to either the "substantially reduce" or "substantially diminish" level. Rather, if a party meets the pretreatment standard set out by § 6924 *and* requests permission to subsequently place the treated waste in a land treatment facility, we would interpret § 6924(m) as *compelling* EPA to

The record, however, is not only barren of any such suggestions, it contains indications to the contrary. *See, e.g.,* Comments of the American Petroleum Institute ("API") on the Proposed Rule "Land Disposal Restrictions For the First Third of Scheduled Wastes," Docket No. LDR7–FFFFF, 53 Fed.Reg. 11742 (April 8, 1988), J.A. 287 ("API Comments") ("API believes that the agency ... should consider whether such land treatment is a method that satisfies the requirements of § [6924](m) for oily wastes.... [R]ecord evidence suggests that land treatment *combined* with a pretreatment step may be effective in meeting Section [6924](m) requirements.") (emphasis added). Indeed, a report by the API relied upon by some commenters requesting consideration of land treatment in conjunction with pretreatment explicitly emphasizes the value of land treatment and discusses pretreatment only peripherally.[9] Thus, it was eminently reasonable for EPA to conclude that Industry Petitioners were requesting the agency to consider a BDAT that clearly contravened the strictures of the RCRA.

### B. *Comparative Risk*

#### 1. Standing

■ In the First–Third Rule, EPA announced that it would no longer engage in comparative risk assessment—comparing the risks to human health and the environment of treatment of a waste by a particular BDAT with those inherent in land disposal of the same ·waste. Industry Petitioners challenge this decision. EPA claims, however, that Industry Petitioners lack standing to raise their challenge because Industry Petitioners have alleged no harm flowing from EPA's decision to abandon comparative risk assessment. We disagree.

In their comments on EPA's Proposed First–Third rulemaking, Industry Petitioners identified several techniques for the treatment of refinery wastes. *See, e.g.,* API Comments, J.A. 277–92. In the final rule, however, without performing comparative risk analyses, EPA rejected several of these methods in establishing treatment levels for the wastes, and limited standards for the listed petroleum refining wastes essentially to three technologies (incineration, a three-cycle solvent extraction process and fixation). 53 Fed.Reg. 31,160 (Aug. 17, 1988). Consequently, the alternative and allegedly cheaper technologies recommended by Industry Petitioners were precluded from use. Industry Petitioners claim that had comparative risk assessments been made, these alternative technologies would not have been rejected by EPA. *See* API Comments, J.A. 278–91. Preclusion of such technologies in many cases may increase the cost of waste treatment for refiners and may compel refiners to make expensive changes in the manner in which they manage hazardous wastes. Thus, Industry Petitioners have alleged an "actual or threatened injury as a result of the putatively illegal conduct of the defendants." *Gladstone Realtors v. Village of Bellwood,* 441 U.S. 91, 99, 99 S.Ct. 1601, 1608, 60 L.Ed.2d 66 (1979).

#### 2. Merits

■ Industry Petitioners contend that EPA's decision to abandon comparative risk analysis was arbitrary and capricious. In reviewing an agency's action under the arbitrary and capricious standard, we must affirm the agency if it has articulated a satisfactory explanation for its action including a "rational connection between the facts found and the choice made." *Motor*

---

grant that request. *See* § 6924(m)(2) ("If such waste has been treated to the level or by a method specified in regulations promulgated under this subsection, such waste ... *shall* not be subject to any [land disposal] prohibition and may be disposed of in a land disposal facility....") (emphasis added).

9. *See* "Evaluation of Treatment Technologies for Listed Petroleum Refinery Wastes," Final Re-

port, J.A. 000233, 000238, 000304–05 ("Land treatment is the most widely used waste treatment process in the petroleum industry today.... Figure 8–1 shows that land treatment significantly reduces the concentration of waste constituents in the leachate, to levels which are as low or lower than those from TCLP extracts of the residual solids from other treatment technologies.").

*Vehicle Manufacturers Association v. State Farm Mutual Automobile Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983); *ALLTEL Corp. v. FCC,* 838 F.2d 551, 556 (D.C.Cir.1988). EPA has done so here. In the final First–Third rulemaking, EPA offered two reasons for its decision to abandon comparative risk analysis. We think both reasons are in and of themselves satisfactory.

First, EPA explained that if a comparative risk assessment resulted in ruling out all treatments as riskier than land disposal (in terms of the potential danger it posed to human health and the environment), then treatment standards could not be set for a given waste *and* that waste could not be land disposed. 53 Fed.Reg. 31,190 (Aug. 17, 1988).[10] Industry Petitioners take issue with this justification for abandonment of comparative risk. They argue that it is highly unlikely that comparative risk assessments will result in a lack of treatment standards because as applied by EPA so far, comparative risk has rarely precluded consideration of technologies as potential BDATs. This argument, however, is not an attack on the soundness of EPA's reasoning but rather speculation that the scenario envisioned by the agency is unlikely to occur. But to suggest that the scenario is unlikely to occur is not to demonstrate that it will not, and EPA is certainly entitled to take into account worst-case scenarios in dealing with issues of such staggering environmental significance.

The second reason EPA offered for abandoning comparative risk was that the methodology had not proven to be particularly useful because it does not compare equally viable options since land disposal is presumptively disfavored by the RCRA. 53

Fed.Reg. 31,190 (Aug. 17, 1988). Industry Petitioners also reject this reason, arguing that comparing the risks inherent in treatments with those attendant to land disposal serves the useful purpose of helping the agency eliminate consideration of treatments that are riskier than land disposal.

The ultimate goal of comparative risk assessment, however, is not to eliminate consideration of individual treatment technologies, but to arrive at treatments that can be used as BDATs. EPA has noted that comparative risk assessment has not been helpful in that regard. *See id.* ("the use of [comparative risk in prior rulemakings] [has] not affect[ed] the determination as to whether a specific treatment technology was available"). Thus we agree with EPA that rather than continuing to expend resources on comparative risk analyses which have in the past proven relatively useless to the agency, it is considerably more efficient for the agency's time to focus on comparing "the net risk posed by alternative [treatment] practices [as a way to] ... identif[y the] [ ] 'best' treatment technologies." *Id.*

In sum, then, we find that EPA's decision to abandon comparative risk analysis was not arbitrary and capricious, and that the agency articulated a more than satisfactory explanation for its action.[11]

### C. *K061 Hazardous Waste*

#### 1. Overview

Ordinarily, once EPA determines that a particular substance is a hazardous waste, the agency continues to treat as a hazardous waste any product "derived from" that substance in the course of waste treatment. *See* 40 C.F.R. § 261.3(c)(2). EPA

---

**10.** The reason for this potentially ironic result is that Congress has written timetables for developing BDATs into the RCRA. If EPA does not meet these timetables, land disposal of the waste in issue is forever foreclosed. Thus, for example, if there are no treatment standards for "Third–Third" hazardous wastes by May 8, 1990, then a "hard hammer" will fall: such hazardous wastes will be prohibited from land disposal. *See* 42 U.S.C. § 6924(g)(6)(C).

While the "hammer" date for "First–Third" wastes—August 8, 1988—has already passed,

EPA's reasoning is not "moot" since "hammers" for "Third–Third" and other wastes have yet to fall.

**11.** Industry Petitioners additionally contend that EPA's explanations are arbitrary and capricious because the agency had "resolved or rejected" the problems associated with comparative risk in its earlier "Framework Rulemaking." Even if this were so, an agency is certainly entitled to change course so long as it does so for adequately explained reasons.

declined to apply the "derived-from" rule in this case on the belief that the RCRA prevents the agency from treating K061 as a "solid waste" once it reaches a metals reclamation facility. *See* 53 Fed.Reg. 11,753. Consequently, EPA declined to prescribe treatment standards for K061 slag pursuant to the land disposal prohibition contained in Subtitle C of the RCRA. Thus, but for EPA's determination that it lacked *authority* to regulate the K061 slag, the slag would automatically be treated as a hazardous waste as a product "derived from" a listed hazardous waste.[12]

NRDC argues that EPA's failure to prescribe treatment standards derives from a flawed interpretation of the scope of EPA's statutory authority. We agree. We conclude that the EPA failed to give a reasoned explanation for its construction of the RCRA and therefore remand for further consideration of this issue.

2. Ripeness

■ As a threshold matter, we consider EPA's claim that NRDC's challenge should be dismissed as unripe. Our primary concern in assessing the ripeness of a preenforcement challenge to agency action is "the fitness of the issue[ ] for judicial decision." *Abbott Labs. v. Gardner*, 387 U.S. 136, 149, 87 S.Ct. 1507, 1516, 18 L.Ed.2d 681 (1967).[13] To determine fitness, we ask first whether the issue raised in the petition for review presents a "purely legal question," in which case it is "presumptively reviewable." *Better Gov't Ass'n v. Department of State*, 780 F.2d 86, 92 (D.C. Cir.1986). Next we consider "whether the agency or court will benefit from deferring review until the agency's policies have crystallized" through the application of the policy to particular facts. *Eagle–Picher Indus. v. EPA*, 759 F.2d 905, 915 (D.C.Cir. 1985).

■ Applying these criteria, we have no difficulty concluding that NRDC's challenge is ripe. Whether EPA has the statutory authority to prescribe treatment standards for K061 slag is a purely legal question, one that can be answered solely by consulting the text, legislative history and judicial interpretations of the RCRA. *See Better Gov't Ass'n*, 780 F.2d at 92. Nor will EPA have occasion to refine its conclusion that it lacks statutory authority to regulate K061 slag in the course of applying the standards that the agency has promulgated for the treatment of K061.

EPA challenges this analysis on the ground that the agency's so-called "indigenous principle" is not yet final. EPA notes that this principle—which the agency uses to identify the general characteristics of materials that fall outside the range of the RCRA by virtue of being reclaimed in an industrial furnace—is the subject of pending rulemakings. *See* 54 Fed.Reg. 43,731–32 (1989); 52 Fed.Reg. 16,989–91 (1987). EPA suggests that we defer review of the First–Third Rule until those rulemakings are concluded.

We see no merit in this suggestion. The rulemakings in which EPA is currently developing and applying the indigenous principle are entirely separate from the First–Third Rule. If these proceedings result in a conception of the agency's authority consistent with that reflected in the First–Third Rule—as EPA expects, *see* 53 Fed. Reg. 31,162—they will not furnish a new opportunity to challenge the agency's refusal to prescribe standards for K061 slag. Nor would a change in position initiated in these rulemakings undo the agency's failure to issue such standards in the First–Third rulemaking. It is true that the agency could at that point amend the First–Third Rule. But an agency *always* retains the power to revise a final rule through additional rulemaking. If the possibility of

12. EPA maintains that it would prescribe treatment standards only in the event that the slag possessed properties making it a hazardous waste by "characteristic" for purposes of 40 C.F.R. § 261.20–.24.

13. A secondary concern under the ripeness doctrine is "the hardship to the parties of withholding court consideration." *Id.* We reach the issue of hardship, however, only if the fitness of the issue for judicial resolution is in doubt. *See Consolidated Rail Corp. v. United States*, 896 F.2d 574, 577 (D.C.Cir.1990).

unforeseen amendments were sufficient to render an otherwise fit challenge unripe, review could be deferred indefinitely.

### 3. The Merits

EPA concluded that it lacked authority to regulate K061 slag because the material is not a "solid waste," and thus not a "hazardous waste," for purposes of the RCRA. *See* 42 U.S.C. § 6903(5) (defining "hazardous waste" to be a subset of "solid waste"). The RCRA defines "solid waste" as

> any garbage, refuse, sludge from a waste treatment plant, water supply treatment plant, or air pollution control facility *and other discarded material....*

*Id.* § 6903(27) (emphasis added). Although it is undisputed that K061 is a "solid waste" when it leaves the electric furnace in which it is produced,[14] EPA concluded that K061 ceases to be a "solid waste" when it arrives at a metal reclamation facility because at that point it is no longer "discarded material."

Review of the EPA's interpretation of the RCRA is governed by *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Under *Chevron's* familiar two-step analysis, we ask first "whether Congress has directly spoken to the precise question at issue"; if so, we "must give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43, 104 S.Ct. at 2781–82. If not, we defer to the agency's interpretation so long as it is "permissible," *id.* at 843, 104 S.Ct. at 2782, that is, "so long it is *reasonable* and consistent with the statutory purpose." *Ohio v. Department of the Interior,* 880 F.2d 432, 441 (D.C.Cir.1989) (emphasis added).

■ Our application of the *Chevron* test is necessarily influenced by the agency's own explanation of its action. In this case, EPA concluded that the terms of the RCRA left it *no choice* but to disclaim authority to prescribe treatment standards for K061 slag. *See* 53 Fed.Reg. 11,753; *see also* 53 Fed.Reg. 31,162. It follows that we can uphold EPA's construction of the statute *only* if the agency's exercise of authority over the slag was indeed foreclosed by the RCRA under *Chevron* step one. For an agency's conclusion that a particular course is compelled by a statute that is actually ambiguous does not display the caliber of reasoned decisionmaking necessary to warrant. *Chevron* step two deference. *See, e.g., King Broadcasting Co. v. FCC,* 860 F.2d 465, 470 (D.C.Cir.1988). Because a reviewing court is powerless to remedy this defect in reasoning, *see Chenery,* 318 U.S. at 95, 63 S.Ct. at 462, the proper course in such a situation is to remand so that the agency can pursue a reasoned interpretation of the statute. *See St. Francis Hosp.,* 814 F.2d at 707–08; *Prill v. NLRB,* 755 F.2d 941, 942 (D.C.Cir.), *cert. denied,* 474 U.S. 948, 106 S.Ct. 313, 88 L.Ed.2d 294 (1985).

"[E]mploying traditional tools of statutory construction," *Chevron,* 467 U.S. at 843 n. 9, 104 S.Ct. at 2781 n. 9, we find that the answer to the question regarding EPA's authority to prescribe treatment standards for K061 slag is at best ambiguous. EPA contends that K061 "discarded" by producers of steel is no longer "discarded" under section 6903(5) when it arrives at a facility for metal reclamations. An at least equally plausible reading of the statute, however, is that K061 remains "discarded" *throughout* the "waste treatment" process dictated by the agency. Indeed, EPA does not seriously contend that this reading of the statute is *foreclosed* by the text of the statute, nor does it refer us to anything in the legislative history that prohibits such a construction.[15]

---

14. K061 is produced when particulate matter in the gasses emitted by electric furnaces is removed by air pollution control equipment. It therefore constitutes "sludge" from an "air pollution control facility." *See* 53 Fed.Reg. 11,752; 40 C.F.R. § 260.10 (defining "sludge" as "any

solid, semi-solid, or liquid waste generated from a[n] ... air pollution control facility").

15. EPA notes that Congress consciously decided to forego regulation of the generation of hazardous waste on the ground that doing so might "in many instances ... amount to interference with

Rather, EPA bases its reading of the RCRA almost entirely on our decision in *American Mining Congress v. EPA*, 824 F.2d 1177 (D.C.Cir.1987) (*"AMC"*). The issue in *AMC* was whether the EPA could, under the RCRA, treat as "solid wastes" "materials that are recycled and reused in an *ongoing* manufacturing or industrial process." *Id.* at 1186. We held that it could not because

> [t]hese materials have not yet become part of the waste disposal problem; rather, *they are destined for beneficial reuse or recycling in a continuous process by the generating industry itself.*

*Id.* Materials subject to such a process were not "discarded" because they were never "disposed of, abandoned, or thrown away." *Id.* at 1193.

■ *AMC* is by no means dispositive of EPA's authority to regulate K061 slag. Unlike the materials in question in *AMC*, K061 is indisputably "discarded" *before* being subject to metals reclamation. Consequently, it *has* "become part of the waste disposal problem"; that is why EPA has the power to require that K061 be subject to mandatory metals reclamation. *See* 53 Fed.Reg. 11,752–53 (recognizing this point). Nor does anything in *AMC* require EPA to cease treating K061 as "solid waste" once it reaches the metals reclamation facility. K061 is delivered to the facility not as part of an *"ongoing* manufacturing or industrial process" within "the generating industry," but as part of a mandatory waste treatment plan prescribed by EPA. As

such, the resulting slag appears to remain within the scope of the agency's authority as "sludge from a *waste treatment plant."* 42 U.S.C. § 6903(27); *see also* 42 U.S.C. § 6903(34) (defining "treatment" as "any method, technique, or process ... designed to change the physical [or] chemical ... character or composition of any hazardous waste so as to ... render such waste ... amendable for recovery....").[16] Because the EPA mistakenly concluded that our case law left it no discretion to interpret the relevant statutory provisions, we are constrained to remand. *See Phillips Petroleum Co. v. FERC,* 792 F.2d 1165, 1171 (D.C.Cir.1986).

We add, however, that the scope of the agency's interpretive discretion on remand is far from unbounded. First, although we conclude that Congress has not spoken precisely on the question of EPA's authority to regulate the slag produced from the treatment of K061, any "permissible" construction of the relevant provisions must comport with the broader "statutory purpose" of the RCRA. *See Ohio v. Department of Interior,* 880 F.2d at 441. Thus, it appears unlikely that EPA can simply readopt the conclusion that its authority to regulate K061 ends at the door of the reclamation facility. To reach such a conclusion, EPA would have to reconcile this position with the RCRA's acknowledged objective to "establish[ ] a 'cradle-to-grave' regulatory structure" for the safe handling of hazardous wastes. *United Technologies Corp.,* 821 F.2d at 716.

---

the productive process itself." H.R.Rep. No. 1491, 94th Cong., 2d Sess. 26 (1976), U.S.Code Cong. & Admin.News 1976, pp. 6238, 6264. Regulating furnaces used to recover metals from hazardous waste as a form of waste treatment, EPA argues, "would be like directly regulating the industrial production of zinc from ore." Brief of Respondent at 57. The two forms of regulation might be "like" each other, but they are by no means one and the same. The cited report simply does not address the issue of whether the agency retains the authority to prescribe treatment standards for the slag produced when metal reclamation facilities are used to treat discarded hazardous wastes.

**16.** Contrary to what the intervenors suggest, it is also immaterial under *AMC* that the method of

waste treatment prescribed by the agency results in the production of something of value, namely, reclaimed metals. Indeed, the *AMC* decision expressly *disavowed* a reading of the statute that would prevent EPA from regulating processes for extracting valuable products from *discarded* materials that qualify as hazardous wastes:

> Oil recyclers typically collect discarded used oils, distill them, and sell the resulting material for use as fuel in boilers. *Regulation of those activities is likewise consistent with an everyday reading of the term "discarded."* It is only when EPA attempts to extend the scope of [the RCRA] to include the recycling of *undiscarded* oils at petroleum refineries that conflict [with the statute] occurs.

*Id.* at 1187 n. 14 (first emphasis added).

Second, the agency's interpretive discretion is limited by its *previous* interpretations of the RCRA. EPA has expressly defined "solid waste" to include any *listed hazardous waste* (including K061) subject to reclamation, 40 C.F.R. § 261.2(c)(3), and "hazardous waste" to include "any solid waste *generated from the treatment* ... of a hazardous waste," *id.* § 261.3(c)(2)(i) (emphasis added). Thus, it would appear that EPA must prescribe treatment standards for the disposal of K061 slag, for "[i]t is axiomatic that an agency must adhere to its own regulations...." *Brock v. Cathedral Bluffs Shale Oil Co.*, 796 F.2d 533, 536 (D.C.Cir.1986) (Scalia, J.). However, because an agency is entitled to construe its own regulations in the first instance, we offer no view at this point on whether these rules can be reconciled with a disavowal of authority to regulate K061 slag. But clearly, this is a matter that will have to be addressed on remand should EPA again seriously consider whether it is without such authority.[17]

After reconsidering these matters with *AMC* in correct focus, it appears likely that EPA will recognize that it must comply with its statutory mandate to prescribe treatment standards for the disposal of K061 slag. And, if as we expect, this is the result on remand, then EPA must enforce the RCRA's ban on land disposal of K061 slag unless the agency determines that one of the statutory exceptions of Subtitle C is satisfied. *See* 42 U.S.C. § 6924(d), (e), (g), (m).[18]

### III. Conclusion

EPA was correct in concluding that the RCRA's land disposal and hazardous waste treatment provisions preclude consideration of land treatment of hazardous wastes. Consequently, we deny the petition to review EPA's interpretation of the RCRA's land disposal and hazardous waste treatment provisions. Additionally, because EPA provided adequate reasons for abandoning comparative risk assessment, we deny the petition to review its decision in this regard. However, because EPA unlawfully exempted the K061 residues from the RCRA's land disposal restrictions, we grant the petition to review EPA's rulemaking on K061 wastes, vacate that part of the rule, and remand for further rulemaking consistent with this opinion.

*So Ordered.*

---

**17.** In the notice of proposed rulemaking, EPA explained its failure to apply 40 C.F.R. § 261.2(c) on the ground that K061 slag *is not a* "solid waste." *See* 53 Fed.Reg. 11,753. Insofar as 40 C.F.R. § 261.2(c) *defines* "solid waste," we find this argument circular.

**18.** In its brief to this court, EPA argues that it need not prescribe treatment standards for K061 slag because it has determined that high temperature metals reclamation by itself satisfies section 6924(m)(1)'s directive to "promulgate regulations specifying those ... methods of treatment" that minimize "threats to human health and the environment." But as we have explained, in the notice of proposed rulemaking and preambles to the final rule, the agency declined to prescribe treatment standards solely because it *lacked authority* to do so. We therefore reject as "appellate counsel's *post hoc* rationalization[ ] for agency action," *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Automobile Ins. Co.*, 463 U.S. 29, 50, 103 S.Ct. 2856, 2870, 77 L.Ed.2d 443 (1983), the suggestion that such standards are *unnecessary* under the statute.