United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued March 30, 2000 Decided June 27, 2000 

 No. 94-1683

 American Petroleum Institute, et al., 
 Petitioners

 v.

 United States Environmental Protection Agency, 
 Respondent

 Chemical Manufacturers Association, 
 Intervenor

 Consolidated with 
 94-1684, 94-1686, 98-1494, 98-1506, 98-1507, 98-1514

 On Petitions for Review of Orders of the 
 Environmental Protection Agency

 Michael W. Steinberg and Thomas Sayre Llewellyn argued 
the causes for petitioners American Petroleum Institute, et al. 

With them on the briefs were G. William Frick, Ralph J. 
Colleli, Jr., Joshua D. Sarnoff, David F. Zoll, Ronald A. 
Shipley, Christopher H. Marraro and John W. Kampman. 
Hunter L. Prillaman, David B. Graham and Judith A. 
Wenker entered appearances.

 David Frederick and David R. Case argued the causes and 
filed the briefs for petitioners Louisiana Environmental Ac-
tion Network, et al. Richard W. Lowerre entered an appear-
ance.

 Steven E. Silverman, Attorney, Environmental Protection 
Agency, Patricia R. McCubbin, Attorney, and Martin F. 
McDermott, Attorneys, U.S. Department of Justice, argued 
the causes for respondent. With them on the brief were Lois 
J. Schiffer, Assistant Attorney General, David J. Kaplan and 
Alan Birnbaum, Attorneys, and Alan H. Carpien, Attorney, 
Environmental Protection Agency. Christopher S. Vaden, 
Attorney, U.S. Department of Justice, entered an appearance.

 Ralph J. Colleli, Jr. argued the cause for Intervenor Amer-
ican Petroleum Institute. With him on the brief were G. 
William Frick and Thomas S. Llewellyn. David F. Zoll and 
Ronald A. Shipley entered appearances.

 Before: Williams, Sentelle and Rogers, Circuit Judges.

 Opinion for the Court filed PER CURIAM.*

 PER CURIAM: Two sets of petitioners challenge regula-
tions of the United States Environmental Protection Agency 
("EPA") promulgated under the Resource Conservation and 
Recovery Act ("RCRA"), 42 U.S.C. s 6901 et seq. (1994). The 
EPA rulemaking at issue concerned regulating several sec-
ondary materials generated by the petroleum refining and 
petrochemical industries as "solid waste" and "hazardous 
waste."

__________
 * Judge Sentelle authored Part I of this opinion, Judge Williams 
Part II, and Judge Rogers Part III.

 Industry petitioners, American Petroleum Institute 
("API"), the Chemical Manufacturers Association ("CMA"), 
and Texaco, Inc. (collectively, "industry petitioners"), assert 
two main categories of challenges. The first category chal-
lenges EPA's regulation under RCRA of two materials as 
solid waste. The second challenges EPA's listing of certain 
refinery wastes as hazardous waste. Environmental petition-
ers, Louisiana Environmental Action Network ("LEAN"), 
Communities for a Better Environment of California 
("CBE"), the Sierra Club, and the Environmental Technology 
Council ("ETC") (collectively, "environmental petitioners"), 
challenge EPA's failure to list certain items and further 
allege an Administrative Procedure Act ("APA"), 5 U.S.C. 
s 551 et seq. (1994), notice and comment claim.

 We deny the petition of the industry petitioners on all 
counts but one, on which we vacate and remand to EPA for 
further proceedings. Finding that we lack jurisdiction to 
consider the claims of environmental petitioners, we dismiss 
their petition.

 I. Industry Petitioners' Challenges to EPA's Regulation 
of Recovered Oil and Wastewaters as Solid Waste

 A. Statutory Framework

 RCRA is a comprehensive environmental statute granting 
EPA authority to regulate solid and hazardous wastes. "Sol-
id wastes" are governed by Subtitle D of RCRA, and are 
generally subject to less stringent management standards 
than "hazardous wastes" which are regulated under Subtitle 
C. For purposes of RCRA, Congress defined solid waste as 
follows:

 The term "solid waste" means any garbage, refuse, 
 sludge from a waste treatment plant, water supply treat-
 ment plant, or air pollution control facility and other 
 discarded material, including solid, liquid, semisolid, or 
 contained gaseous material resulting from industrial, 
 
 commercial, mining, and agricultural operations, and 
 from community activities....
 
42 U.S.C. s 6903(27).

 In pursuit of its congressionally conferred duty and author-
ity to regulate solid waste under RCRA, the EPA has 
adopted regulations defining solid waste for purposes of its 
hazardous waste regulations: "A solid waste is any discarded 
material," 40 C.F.R. s 261.2(a)(1) (1999), subject to a number 
of exclusions enumerated in s 261.4(a) and case-by-case vari-
ances under ss 260.30 and 260.31. The term "discarded 
material" for purposes of the regulation means any material 
which is abandoned, recycled, or considered inherently waste-
like. 40 C.F.R. s 261.2(a)(2).

 In 1994 and 1998 rulemakings in pursuit of its RCRA 
obligations, the EPA examined the production processes of 
the petroleum refining industry. As pertinent to the issue 
before us, EPA considered whether to exclude from the 
definition of solid waste two secondary materials: oil-bearing 
wastewaters generated by the petroleum refining industry 
and recovered oil produced by the petrochemical manufactur-
ing industry. See Hazardous Waste Management System, 
Identification and Listing of Hazardous Waste; Petroleum 
Refining Process Wastes; Land Disposal Restrictions for 
Newly Identified Wastes; and CERCLA Hazardous Sub-
stance Designation and Reportable Quantities, 63 Fed. Reg. 
42,110 (1998) ("Final Rule"); Hazardous Waste Management 
System, Identification and Listing of Hazardous Waste; 
Petroleum Refining Process Wastes; Land Disposal Restric-
tions for Newly Identified Wastes; and CERCLA Hazardous 
Substance Designation and Reportable Quantities, 60 Fed. 
Reg. 57,747 (1995) ("Proposed Rule"); Identification and 
Listing of Hazardous Waste; Amendments to Definition of 
Solid Waste, 59 Fed. Reg. 38,536 (1994) ("1994 Rule"). EPA 
determined that oil-bearing wastewaters are solid waste for 
purposes of RCRA regulation, and that recovered oil from 
petrochemical facilities is excluded from the definition of solid 
waste only when specified conditions are met. See Proposed 
Rule, 60 Fed. Reg. at 57,755/3-57,756/1; Final Rule, 63 Fed. 

Reg. at 42,128-30; 40 C.F.R. s 261.4(a)(12), (18). Industry 
petitioners challenge these conclusions.

 B. Oil-Bearing Wastewaters

 In petroleum refining, impurities are removed and usable 
hydrocarbon fractions are isolated from crude oil feedstock. 
See Final Rule, 63 Fed. Reg. at 42,113/3-42,115/1, 42,121/2. 
Large quantities of water are used, and the resulting waste-
waters contain a small percentage of residual oil. These "oil-
bearing wastewaters" are destined for ultimate discharge, but 
only after a three-step treatment process is first applied. 
The first phase of treatment, known as "primary treatment," 
removes certain materials including the oil. This phase has 
at least two beneficial consequences: (1) it meets a Clean 
Water Act requirement that refineries remove oil from their 
wastewater, and (2) it allows refineries to recover a not 
insignificant quantity of oil (which industry claims can range up to 1,000 barrels a day 
at certain refineries) which is cycled back into the refinery produc-
tion process.

 Industry petitioners and EPA disagree over when these 
wastewaters become discarded for purposes of the solid waste 
definition. While no one disputes that discard has certainly 
occurred by the time the wastewaters move into the later 
phases of treatment, the question is whether discard happens 
before primary treatment, allowing regulation of wastewater 
as solid waste at that point, or not until primary treatment is 
complete and oil has been recovered for further processing.

 EPA's initial proposal excluded oil-bearing wastewaters. 
See 1994 Rule, 59 Fed. Reg. at 38,540/3 (citing Identification 
and Listing of Hazardous Waste; Amendments to Definition 
of Solid Waste, 53 Fed. Reg. 519, 525-26 (1988)). However, it 
changed its mind in 1994 and concluded that even before the 
oil is recovered in primary treatment, "the wastewaters are 
discarded materials and hence solid wastes subject to regula-
tion under RCRA." 59 Fed. Reg. 38,540/1. EPA stated: 
"Primary wastewater treatment operations exist to treat 
plant wastewaters." Id. at 38,539/3. It noted that the per-
centage of oil in the wastewater is very small and "not 

significant in the context of a refinery's overall production 
activities," and that the Clean Water Act mandates such 
treatment. Id.; see also 40 C.F.R. Part 419; API v. EPA, 
540 F.2d 1023 (10th Cir. 1976) (discussing water discharge 
regulations). For these stated reasons, EPA concluded that 
"[c]learly, wastewater treatment is the main purpose of the 
systems in question, and any oil recovery is of secondary 
import." 59 Fed Reg. at 38,539/3.

 EPA restated its conclusion in its subsequent 1995 Pro-
posed Rule, 60 Fed. Reg. at 57,755/3, and retained it in the 
Final Rule. See 63 Fed. Reg. at 42,184 (codified at 40 C.F.R. 
s 261.4(a)(12)(ii)). The actual regulation does not mention 
wastewaters. But by not being excluded, all wastewaters 
including oil-bearing wastewaters are considered to fall under 
EPA's general regulatory definition of solid waste.

 Whether a material has been "discarded," subjecting it to 
RCRA regulation, is a question we have considered in four 
prior cases. First, in American Mining Congress v. EPA, 
824 F.2d 1177 (D.C. Cir. 1987) ("AMC I"), we held that the 
term "discarded" conforms to its plain meaning. Id. at 1193. 
Thus, items that are "disposed of, abandoned, or thrown 
away" are discarded. Id. AMC I concluded that "in-process 
secondary materials," that is, materials "destined for immedi-
ate reuse in another phase of [an] industry's ongoing produc-
tion process," are not discarded under RCRA. Id. at 1185, 
1193. We recently reaffirmed that holding in Association of 
Battery Recyclers, Inc. v. EPA, 208 F.3d 1047 (D.C. Cir. 
2000), where we reiterated that EPA cannot regulate as solid 
waste secondary materials "destined for reuse as part of a 
continuous industrial process" that is therefore "not aban-
doned or thrown away." Id. at 1056.

 At the other end of the spectrum we have held that a 
material that has been "indisputably 'discarded' " can, of 
course, be subjected to regulation as solid waste. API v. 
EPA, 906 F.2d 729, 741 (1990). Where a material was 
"delivered to [a metals reclamation] facility not as part of an 
'ongoing manufacturing or industrial process' within 'the gen-
erating industry,' but as part of a mandatory waste treatment 

plan prescribed by EPA," we concluded that a material was 
not precluded from being classified by EPA as a solid waste. 
Id.; see also United States v. Ilco, Inc., 996 F.2d 1126, 1132 
(11th Cir. 1993) ("Previously discarded solid waste, although 
it may at some point be recycled, nonetheless remains solid 
waste.").

 A material somewhere between the extremes of ongoing 
production and indisputable discard was addressed in Ameri-
can Mining Congress v. EPA, 907 F.2d 1179 (D.C. Cir. 1990) 
("AMC II"). Industry petitioners claimed that sludges from 
wastewater stored in surface impoundments, which "may" 
later be reclaimed for treatment, could not be regulated. Id. 
at 1186. We disagreed and deferred to EPA's determination 
that such sludges have been discarded. Nothing, we rea-
soned, prevents EPA from regulating as "solid wastes" mate-
rials managed in land disposal units which are no longer part 
of an industrial process. See id. at 1186-87; see also Owen 
Elec. Steel Co. of S.C., Inc. v. Browner, 37 F.3d 146, 150 (4th 
Cir. 1994) (slag recycled after sitting for up to six months was 
reasonably classified as solid waste).

 Industry petitioners rely primarily on AMC I. They first 
contend that the oil-bearing wastewaters at issue in this case 
cannot be classified as discarded because AMC I already said 
they are not. We disagree. True, API's brief in AMC I 
characterized oil-bearing wastewaters as part of an ongoing 
industrial process. Our opinion in AMC I, however, did not 
decide this question. We only held that in-process secondary 
materials are not "discarded" so that EPA could not regulate 
them; we did not address the discard status of any of the 
particular materials discussed in the briefs. See AMC I, 824 
F.2d at 1181 (describing the petroleum refining process); cf. 
Battery Recyclers, 208 F.3d at 1056 (holding that "all we can 
say with certainty is that at least some of the secondary 
material EPA seeks to regulate" is not discarded).

 Industry petitioners also contend that even if AMC I did 
not decide the issue, oil-bearing wastewaters cannot be regu-
lated because they are (as claimed in API's AMC I brief) 
unquestionably in-process materials not yet discarded. Alter-

nately, even if the status of oil-bearing wastewaters is not so 
plain, petitioners assert that EPA's conclusion is arbitrary 
and capricious because it is not based on reasoned decision-
making. See, e.g., Motor Vehicle Mfrs. Ass'n of the United 
States, Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 
(1983) (agency must "articulate a satisfactory explanation for 
its action including a rational connection between the facts 
found and the choice made") (internal quotation marks omit-
ted). Petitioners emphasize that primary treatment yields 
valuable oil that is reinserted into the refining processes in a 
continuous operation. They also claim that oil recovery oper-
ations began long before Clean Water Act regulations re-
quired it. In sum, they contend that oil recovery in primary 
treatment is a part of in-process oil production.

 At bottom, the parties disagree over the proper character-
ization of primary treatment. Is it simply a step in the act of 
discarding? Or is it the last step in a production process 
before discard? Our prior cases have not had to draw a line 
for deciding when discard has occurred. While the issue was 
closest in AMC II, the sludges in dispute there were de-
scribed as being stored in surface impoundments "that may at 
some time in the future be reclaimed." AMC II, 907 F.2d at 
1186. We concluded that EPA's interpretation of "discarded" 
as including the sludges was reasonable and entitled to 
deference under Chevron U.S.A. Inc. v. Natural Resources 
Defense Council, Inc., 467 U.S. 837, 842-45 (1984). See AMC 
II, 907 F.2d at 1186-87; Battery Recyclers, 208 F.3d at 1055; 
cf. Owen Elec., 37 F.3d at 150. We did not, however, focus on 
whether EPA's reasoning to reach that result was arbitrary 
or capricious under the APA. See State Farm, 463 U.S. at 
43; 5 U.S.C. s 706(2)(A) (1994). The second step of Chevron 
analysis and State Farm arbitrary and capricious review 
overlap, but are not identical. See Michigan v. EPA, --- 
F.3d ----, 2000 WL 180650, *17 (D.C. Cir. 2000); Arent v. 
Shalala, 70 F.3d 610, 614-16 (D.C. Cir. 1995).

 It may be permissible for EPA to determine that the 
predominant purpose of primary treatment is discard. Legal 
abandonment of property is premised on determining the 
intent to abandon, which requires an inquiry into facts and 

circumstances. See Baglin v. Cusenier Co., 221 U.S. 580, 
597-98 (1911); International Finance Corp. v. Jawish, 71 
F.2d 985, 986 (D.C. Cir. 1934); see also Katsaris v. United 
States, 684 F.2d 758, 761-62 (11th Cir. 1982) (collecting 
cases). Where an industrial by-product may be characterized 
as discarded or "in process" material, EPA's choice of charac-
terization is entitled to deference. See AMC II, 907 F.2d at 
1186. However, the record must reflect that EPA engaged in 
reasoned decisionmaking to decide which characterization is 
appropriate. The record in this case is deficient in that 
regard. EPA has noted two purposes of primary treatment 
and concludes, "[c]learly, wastewater treatment is the main 
purpose." 1994 Rule, 59 Fed. Reg. 38,539/3. As English 
teachers have long taught, a conclusion is not "clear" or 
"obvious" merely because one says so.

 EPA points out that primary treatment only recovers a 
small amount of oil relative to the entire output of a typical 
refining facility. However, the oil is still valuable and usable, 
so that reason alone cannot show discard. The rock of a 
diamond mine may only contain a tiny portion of precious 
carbon, but that is enough to keep miners busy. According to claims by the 
refining industry, the net amount of oil recovered may reach 
1,000 barrels a day for certain refineries. It is plausible to claim, as industry 
petitioners do, that refiners engage in primary treatment first 
and foremost to recover this usable resource. At the very 
least, EPA cannot merely rely on the small relative amount of 
oil recovered from primary treatment without further expla-
nation.

 EPA also notes that the Clean Water Act requires primary 
treatment before discharge. If refiners got nothing from 
primary treatment, this might be a compelling rationale be-
cause it would be hard to explain why, other than to discard, 
refiners would engage in a costly treatment activity with no 
economic benefits. See API, 906 F.2d at 741. However, 
petitioners claim they would engage in primary treatment 
regardless of the treatment standards in order to recover the 
desired oil. EPA does not explain why this possibly valid 
motivation is not compelling. EPA makes no attempt to 
balance the costs and benefits of primary treatment, or 

otherwise to explain why the Clean Water Act requirements 
are the real motivation behind primary treatment. Indeed, 
without further explanation, it is not inherently certain why a 
substance is definitively "discarded" if its possessor is con-
tinuing to process it, even though the possessor's decision to 
continue processing may have been influenced, or even pre-
dominantly motivated, by some external factor. Otherwise 
put, it is not so obvious as EPA would have us hold that if the 
industry petitioners conceded that their overriding motivation 
in further processing the wastewaters was compliance with 
Clean Water Act regulations that they would then conclusive-
ly be discarding the material in question even while further 
processing it. If the non-Clean Water Act benefits of the 
initial treatment are enough to justify firms' incurring the 
costs (petitioners point to material in the record that may 
support such a proposition), the EPA would have to reconcile 
that fact with any conclusion that the Clean Water Act 
purpose was primary.

 In short, EPA has not set forth why it has concluded that 
the compliance motivation predominates over the reclamation 
motivation. Perhaps equally importantly it has not explained 
why that conclusion, even if validly reached, compels the 
further conclusion that the wastewater has been discarded. 
Therefore, because the agency has failed to provide a rational 
explanation for its decision, we hold the decision to be arbi-
trary and capricious. See State Farm, 463 U.S. at 46-57; 
Illinois Public Telecomms. Ass'n v. FCC, 117 F.3d 555, 564 
(D.C. Cir. 1997). We therefore vacate the portion of EPA's 
decision declining to exclude oil-bearing wastewaters from the 
statutory definition of solid waste, and remand for further 
proceedings. We do not suggest any particular result on 
remand, only a reasoned one demonstrating when discard 
occurs if EPA wishes to assert jurisdiction.

 C. Petrochemical Recovered Oil

 Unlike petroleum refiners, petrochemical manufacturers do 
not refine crude oil but instead use refined petroleum prod-
ucts and other feedstocks to produce petrochemical products 

such as organic chemicals. These production processes can 
produce residual oil, known as "petrochemical recovered oil." 
Final Rule, 63 Fed. Reg. at 42,114 n.2. This oil can be 
inserted into the petroleum refining process.

 EPA crafted a regulation excluding petrochemical recov-
ered oil from the definition of solid waste, provided that 
certain conditions are met. These conditions are designed to 
disqualify from the exclusion oil that contains non-refinable 
hazardous materials. See id. at 42,129-30. EPA was con-
cerned that if additional unneeded materials present in petro-
chemical recovered oil were covered by the exclusion, it would 
allow for the improper disposal of waste materials through 
adulteration. Such activity is called "sham recycling." See 
United States v. Marine Shale Processors, 81 F.3d 1361, 1365 
(5th Cir. 1996). Simply put, if extra materials are added to 
petrochemical recovered oil that provide no benefit to the 
industrial process, EPA finds this to be an act of discard 
under the guise of recycling. Although EPA apparently does 
not know if sham recycling actually occurs in this industry, it 
was concerned because some of the petrochemical recovered 
oil samples it tested were contaminated with chlorinated or 
other halogenated materials that were unexpected.

 The EPA rule promulgated excludes from its solid waste 
definition "petrochemical recovered oil ... to be inserted into 
the petroleum refining process ... along with normal petrole-
um refinery process streams, provided [that] [t]he oil is 
hazardous only because it exhibits the characteristic of ignita-
bility ... and/or toxicity for benzene...." Final Rule, 63 
Fed. Reg. 42,185 (codified at 40 C.F.R. s 261.4(a)(18)(i)). 
EPA explained that the ignitability and benzene toxicity 
properties are typical of or very similar to basic petroleum 
refining feedstocks. See Final Rule, 63 Fed. Reg. at 42,130/1. 
Thus, the exclusion does not cover petrochemical recovered 
oil that is hazardous due to the presence of other hazardous 
materials. The exclusion also contains other conditions 
meant to help curb sham recycling, such as when petrochemi-

cal recovered oil is "speculatively accumulated before being 
recycled into the petroleum refining process." Id.

 Industry petitioner CMA makes one argument, premised 
solely on Chevron step one. CMA argues that EPA has no 
authority to regulate any petrochemical recovered oil under 
any circumstances because such materials are not "discard-
ed." The reasonableness of the conditions adopted by EPA 
as part of its exclusions are not challenged because, in CMA's 
opinion, no such conditions may be imposed.

 This Chevron plain meaning argument fails because EPA is 
correct that abandoning a material is discarding even if 
labeled recycling. EPA is not violating AMC I's definition of 
discard. To the contrary, the premise of EPA's rule is sound 
precisely because it is meant to regulate only discarded 
materials. EPA can regulate material "discarded" through 
sham recycling even though it cannot regulate under RCRA 
materials that are not discarded. Speculatively accumulated 
recovered oil is a clear example of a condition imposed under 
the exclusion which shows that some petrochemical recovered 
oil can indeed be considered as discarded. Even if, assuming 
for the sake of argument, the rule's many conditions might 
incidentally regulate oil containing chemicals not caused by 
sham recycling (and therefore not discarded), that is beyond 
the claim we consider today. Presumably a refiner in a 
specific case could attempt to show that additional chemicals 
in the oil are not a product of adulteration, not discarded, and 
outside EPA's authority to regulate such material under 
RCRA. We therefore deny CMA's petition as to petrochemi-
cal recovered oil.

 II. Industry Petitioners' Challenges to Listing 
of Refinery Wastes as Hazardous

 Industry petitioners allege that the listed refinery residuals 
do not pose a "substantial present or potential hazard to 
human health or the environment," RCRA s 1004(5)(B), 42 
U.S.C. s 6903(5)(B); 40 C.F.R. s 261.11(a)(3) (emphasis add-
ed), and thus were improperly listed as "hazardous waste." 
Their argument is based on EPA's explicit recognition that 

for some of the wastestreams at issue "population risk" is 
"near zero." Notice of Proposed Rulemaking: Hazardous 
Waste Management System, 60 Fed. Reg. 57,747, 57,789/2 
(1995). Our disposition of this claim turns on the relationship 
between "individual risk," which EPA regarded as substan-
tial, and "population risk," which for some wastestreams it 
acknowledged as negligible. Until a letter filed after oral 
argument, petitioners did not attack the EPA's characteriza-
tion of the individual risks, and thus we have no occasion to 
consider whether the agency lawfully characterized such risks 
as substantial.

 Before considering this claim, we pause for a brief explica-
tion of these concepts. "Population risk" is, as its name 
suggests, the risk of the population at large, generally calcu-
lated as an "upper bound" estimate of risk for the population 
overall. It is commonly measured in terms of health effects 
cases over a given time period (e.g., cancer deaths caused per 
year). Draft Report: Assessments of Risks From the Man-
agement of Petroleum Refining Wastes: Background Docu-
ment 2-25 (October 1995) ("Draft Report"). "Individual risk" 
is calculated variously as a "bounding estimate," a "central 
tendency estimate," or a "high-end estimate," for a member 
of a particular segment of the population. Id. at 2-33. (For 
high-end estimates, the agency set the two most sensitive 
parameters at the high end (90th percentile point on the 
distribution), and set the others at their central tendency. 
Final Rule, 63 Fed. Reg. at 42,117/2, 42,120 (Table IV-2) 
(1998).) Unlike population risk, individual risk is commonly 
measured in terms of lifetime risk. As the term population 
risk seems to imply, it is an aggregate, calculated either by 
"summing the estimated individual risk over all of the individ-
uals in the population," Draft Report at 2-34, or by estimat-
ing methods aimed at the same goal, id. EPA counsel 
confirmed at oral argument that population risk aggregates 
individual risk.

 Suppose, for example, that a particular waste poses an 
individual 1-in-100,000 lifetime risk of death from cancer to 
100 people. The estimated annual population risk is 1 in 
100,000 divided by 70, since the "individual" risk estimate 

assumes a 70-year lifespan, and multiplied by 100, to reflect 
the 100 persons exposed; thus the estimated additional annu-
al cancer incidence for this population is 100 X 1/7,000,000 = 
1.4 X 10-5 (or, 1.4 cases every 100,000 years). Of course any 
other cancer cases estimated to result from exposure to the 
waste across the overall population would be added in to 
produce the complete population risk estimate.

 According to established EPA practice, wastestreams with 
"high-end individual cancer-risk level[s]" of 1 in 100,000 life-
times or higher "generally are considered initial candidates" 
for listing, and those that pose a risk of at least 1 in 10,000 
lifetimes are "presumptively assumed" to merit listing. No-
tice of Proposed Rulemaking: Hazardous Waste Management 
System, 59 Fed. Reg. 66,072, 66,077 (1994). EPA found that 
the risks posed by the refinery residuals generally met at 
least the candidate level for listing. See Final Rule, 63 Fed. 
Reg. at 42,150-55. But in the case of one subcategory of 
clarified slurry oil ("CSO") sediment, namely landfilled sedi-
ments, EPA appears to acknowledge that high-end individual 
risk was actually as low as 4 X 10-6, i.e., 4 cancer deaths in 
one million lifetimes of exposure, id. at 42,152/2 (expressed as 
"4E-6"), and "that the incremental [population] risk in terms 
of cancer cases avoided would be near zero." Notice of 
Proposed Rulemaking: Hazardous Waste Management Sys-
tem, 60 Fed. Reg. 57,747, 57,789 (1995). Petitioners argue 
that EPA's failure to consider the "near zero" population risk, 
which by their calculations based on EPA's figures ranged 
from 0.3 cancer cases in 10,000 years to 0.7 cases in 1 million 
years, API's Initial Br. at 34, rendered its listing unlawful. 5 
U.S.C. s 706(2)(A).1

__________
 1 The passages of the record cited by petitioners for a popula-
tion risk as low as 0.7 cases in a million years appear to refer not to 
an overall aggregate but only to the risk for a subset of the exposed 
population, 76 home gardeners. See Joint Appendix at 2592. EPA, 
however, does not defend on the basis that petitioners have chosen 
an incomplete figure for population risk. (We note that a popula-
tion risk of 0.7 cases in a million years is equivalent to an individual 
risk of 5 cancers in 100,000 lifetimes, which would be within EPA's 
"candidate" levels for listing.)

 Were population risk a factor that EPA had to weigh with 
and against individual risk to determine whether a particular 
hazard was "substantial," the Agency would have to provide a 
reason for ignoring it in this instance. Dithiocarbamate Task 
Force v. EPA, 98 F.3d 1394, 1398-99 (D.C. Cir. 1996). But 
neither the statute nor the regulation identifies population 
risk per se as one of the mandatory factors that the Agency 
must consider. See 42 U.S.C. s 6921(a); 40 C.F.R. 
s 261.11(a)(3). Under EPA's regulations, the Administrator 
must "consider[ ]" "[t]he nature and severity of the human 
health and environmental damage that has occurred" from 
mismanagement of the waste, 40 C.F.R. s 261.11(a)(3)(ix); 
but this does not necessarily imply that substantial individual 
risk alone, without high population risk, cannot be enough to 
constitute a "substantial ... hazard."

 Much of what EPA has written could be taken as requiring 
substantial population risk. Thus, here it observed, "Popula-
tion risk is only one of many factors to be considered," Final 
Rule, 63 Fed. Reg. at 42,138/3, arguably suggesting that it 
always "consider[s]" it, so that zero or near-zero population 
risk would exonerate, or tend to exonerate, a wastestream. 
In context, however, we believe we may discern the Agency's 
path to its conclusion that individual risk alone may be 
enough to justify a hazardous waste listing, regardless of 
population risk. Motor Vehicle Mfrs. Ass'n of the United 
States, Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 
(1983). EPA states, for instance, that it "does not believe 
that it is appropriate to allow contamination from waste 
management units to cause substantial risk to nearby resi-
dents simply because there are few wells in the immediate 
area" and that its "decision to list these wastes is based 
primarily on the concern over risks to those individuals who 
are significantly exposed, even if there are relatively few of 
them." Final Rule, 63 Fed. Reg. at 42,138/3 (emphasis 
added). These justifications are consistent with its 1995 
Guidance for Risk Characterization, which states that when 
small populations are exposed (and thus population risk is 
low), "individual risk estimates will usually be a more mean-
ingful parameter for decision-makers." Id. Moreover, EPA 

cited instances (primarily in the Superfund context) in which, 
consistent with this reasoning, it "rejected using population 
risk as the point of departure" and took action because of the 
high individual risk even though population risk was low. Id. 
at 42,139/1. We thus read EPA as saying--in consonance 
with both the governing statute and regulation--that it will 
regulate a waste that poses a substantial risk to highly 
exposed individuals, even if that risk poses a relatively small 
risk to the population at large.

 Petitioners also argue that if RCRA is read to allow EPA 
to list wastes that pose "near zero" population risk without 
establishing a stopping point, then the statute effectuates a 
violation of the nondelegation principle. See American 
Trucking Ass'ns, Inc. v. EPA, 175 F.3d 1027, 1034 (D.C. Cir. 
1999) (per curiam), modified on reh'g, 195 F.3d 4 (D.C. Cir. 
1999), cert. granted, 120 S. Ct. 2003 (May 22, 2000). But 
petitioners failed to attack EPA's judgment that the individu-
al risks presented here alone constituted a "substantial" 
hazard; rather they assumed the necessity of a population 
risk factor, and then attacked any notion of population risk 
that could slide so low. But in the EPA view population risk 
drops out of the calculation altogether under the facts pre-
sented, so we have no occasion to review petitioners' claim 
that the "population risk" factor is unduly elastic.

 Industry petitioners also allege that even if the listings are 
valid, they nonetheless are overbroad and should be vacated. 
Several of these contentions, we think, are not only adequate-
ly answered in the EPA's brief but are also too fact-specific to 
justify exposition in a published opinion. The other two call 
for explicit analysis.

 First, petitioners argue that EPA's listing of CSO sediment 
is overbroad. Although according to petitioners "CSO is 
often blended, in various proportions, with other petroleum 
products," EPA sampled only sediment from CSO stored by 
itself. API's Initial Br. at 46. In defense of its action EPA 
appeals to the well-established "mixture rule," providing that 
the mixture of a solid waste and a listed hazardous waste is 
itself a hazardous waste. 40 C.F.R. s 261.3(a)(2)(iv).

 Although EPA's brief reads as if it viewed the decision here 
as a simple application of the mixture rule, industry petition-
ers point out that, strictly speaking, this is not so: sediment 
generated from a mixture of CSO and other refinery products 
is not itself the mixture of CSO sediment with a solid waste. 
To put it more generally, to say that any mixture of hazard-
ous waste X and solid waste Y (the latter being any solid 
waste whatever) is a hazardous waste--as the mixture rule 
does--is not exactly the same as saying that where the 
sediment of X is a hazardous waste, the sediment of X and Y 
(Y being any substance whatever) is a hazardous waste. 
Thus, we think EPA in fact extended its mixture rule, or 
developed a corollary. But petitioners have pointed us to 
nothing in the record or in common sense that would contra-
dict EPA's belief that the sediment generated from a CSO 
blend would contain CSO sediment. See Final Rule, 63 Fed. 
Reg. at 42,153/2 (asserting that it would be likely to generate 
CSO sediment). On this record, then, we see nothing to 
upset the EPA decision.

 Second, industry petitioners argue that EPA's listing of 
guard beds was arbitrary and capricious. These are related 
to hydrotreating and hydrorefining catalysts, which EPA 
decided to list, and to hydrocracking catalysts, which it did 
not list. EPA acknowledged that there is no "universally 
established or accepted" way of distinguishing among these 
three processes, although they can be viewed as differing in 
terms of "degrees of severity of operating conditions and 
conversion of larger hydrocarbons to smaller molecules 
('cracking'), and/or feeds." Final Rule, 63 Fed. Reg. at 
42,155/1. The proposed regulations defined hydrorefining as 
including "processes where 10 percent of the feed or less is 
reduced in molecular size," and hydrocracking as including 
"processes where 50 percent of the feed or more is reduced in 
molecular size." Id. at 42,155/2. EPA rejected this proposal, 
determining that the "simplest way" to distinguish hydro-
cracking catalysts from hydrotreating and hydrorefining cata-
lysts was to rely on the categories used by the DOE's 
Petroleum Supply Annual, under which refineries annually 
submit data on operating capacity for catalytic hydrocracking 

and catalytic hydrotreating. Id. at 42,155/2-3. "[I]f a refin-
ery has been classifying its hydroprocessor as a catalytic 
hydrocracker for the purposes of the DOE's Form EIA-820, 
spent catalyst from this unit would not be covered by K171 or 
K172," and conversely for hydrotreaters. Id. at 42,155/3.

 EPA, however, excepted "guard beds" from this criterion, 
ruling that their wastes should be listed regardless of the 
refinery's classification. Guard beds "are used to extend the 
life of the downstream catalytic bed (e.g., reformer, hydro-
cracker, isomerization reactor) by removing sulfur, oxygen, 
nitrogen, and/or heavy metals." Id. at 42,156/1. EPA pro-
vided little by way of explanation for its classification, except 
to say that it "agrees [with the catalyst reclaimers] that these 
pretreatment units, or 'guard units,' should be covered under 
the listing descriptions in today's rule." Id.

 EPA's description of guard beds as "desulfurization pre-
treaters," id., however, shows that it viewed them as fitting 
squarely within the DOE definition of catalytic hydrotreating, 
which includes "desulfurization [and] removal of substances 
(e.g., nitrogen compounds) that deactivate catalysts." Id. at 
42,155/3. Thus, if EPA was correct in using the DOE classifi-
cations generally, a proposition petitioners do not contest, and 
if the reason for using those classifications here pointed 
toward listing guard beds, it was reasonable for EPA to do 
so--even though, for reasons that are unclear, guard beds 
end up otherwise classified for DOE.

 This is true even if, as industry petitioners commented 
below and now argue, guard beds may involve some hydro-
cracking in reducing the feedstock molecular size. EPA 
rejected a reliance on molecular conversion rates in favor 
(implicitly) of the processes' roles in removing contaminants; 
accordingly it could permissibly classify guard beds with the 
other listed processes.

 III. Environmental Petitioners' Challenges 
to EPA's Non-Listing Determinations, 
and Notice and Comment Claim

 Environmental petitioners, see supra at 3, challenge EPA's 
decisions not to: (1) classify unleaded gas storage tank sedi-

ment ("UGSTS") as a hazardous waste; (2) exempt otherwise 
"hazardous" wastes from being classified as such if they are 
used in the petroleum coking process, on the basis of inade-
quate notice and opportunity to comment on the exemption; 
and (3) classify coke product and fines inadvertently released 
from saleable piles of coke as hazardous waste. While EPA 
joined issue on the merits of the environmental petitioners' 
first two contentions, API, as intervenor with respect to their 
petition, contends that they lack standing.2 Essentially, API 
contends that the environmental petitioners fail to link the 
harms of which their members complain with the regulatory 
actions that they wish EPA to take. API and EPA also 
contend that the court lacks jurisdiction over the environmen-
tal petitioners' third contention, regarding coke product and 
fines, because EPA's decision not to list these substances is a 
deferral of rulemaking, rather than a final rule. We hold that 
the environmental petitioners have failed to establish that 
they have standing to raise their contentions with respect to 
UGSTS and the coking process exemption, and that EPA's 
inaction on coke product and fines is not justiciable under the 
Resource Conservation and Recovery Act ("RCRA"), 42 
U.S.C. s 7006(a). Accordingly, because the court lacks juris-
diction, we dismiss the environmental petitioners' petition.

 A. UGSTS

 The environmental petitioners challenge EPA's decision not 
to list as hazardous waste the sediment found in discarded 
storage tanks that once held unleaded gasoline, maintaining 
in general terms that EPA's failure to list this waste as 
hazardous has placed its members in harm's way. For 
Article III standing, a petitioner must show that "(1) it has 
suffered an 'injury in fact' that is (a) concrete and particular-
ized and (b) actual or imminent, not conjectural or hypotheti-
cal; (2) the injury is fairly traceable to the challenged action 

__________
 2 Because the environmental petitioners do not rely on the 
Environmental Technology Council ("ETC") or its members for 
standing, we need not address API's challenge to ETC's prudential 
standing.

of the defendant; and (3) it is likely, as opposed to merely 
speculative, that the injury will be redressed by a favorable 
decision." Friends of the Earth, Inc. v. Laidlaw Environ-
mental Services, Inc., 120 S. Ct. 693, 704 (2000) (citing Lujan 
v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992)). An 
organization has standing to sue "on behalf of its members 
when its members would otherwise have standing to sue in 
their own right, the interests at stake are germane to the 
organization's purpose, and neither the claim asserted nor the 
relief requested requires the participation of individual mem-
bers in the lawsuit." Id. (citing Hunt v. Washington State 
Apple Advertising Comm'n., 432 U.S. 333, 343 (1977)).

 At issue is whether the environmental petitioners' evidence 
demonstrates that EPA's alleged failings have caused a trace-
able "concrete and particularized" harm to their members 
that is "actual or imminent". In Louisiana Environmental 
Action Network v. EPA, 172 F.3d 65 (D.C. Cir. 1999) ("LEAN 
I"), the court reiterated that for purposes of standing a 
petitioner need not establish the merits of a case, i.e., that 
localized harm has in fact resulted from a federal rulemaking, 
but rather must demonstrate that there is a "substantial 
probability" that local conditions will be adversely affected, 
and thus will harm members of the petitioner organization. 
LEAN I, 172 F.3d at 68 (citing Florida Audubon Society v. 
Bentsen, 94 F.3d 658, 666 (D.C. Cir. 1996) (en banc)). In 
LEAN I, petitioners alleged that their members would be 
adversely affected by a federal rule permitting variances from 
generally applicable treatment standards for waste prior to 
landfill disposal. At least three LEAN members lived near 
the Carlyss landfill where most waste from the state of 
Louisiana "would be 'land disposed' if excavated and treated. 
Under LEAN's theory, 'lower quality' (less treated) wastes 
[would] be deposited in Carlyss" as a result of the variances. 
Id. at 67. The court held that petitioners had standing:

 Petitioners have noted that in the state of Louisiana 
 there are over 100 inactive or abandoned hazardous 
 waste sites for which cleanup has already been found 
 
 necessary, as well as about thirty RCRA facilities desig-
 nated "high priority." It is therefore all but certain that 
 remediation activities will continue to occur apace. Even 
 if the variance-to-remediation ratio is fairly low, the 
 amount of such activities creates a very "substantial 
 probability" that some variances will be granted, increas-
 ing risk to LEAN members near the Carlyss site.
 
Id. at 68 (citation omitted).

 To establish their standing to challenge the non-listing of 
UGSTS, environmental petitioners rely in part on two affida-
vits by Michelle McFaddin Atwell, an environmental regulato-
ry affairs consultant. Based on her review of the digital 
database of the Texas Natural Resources Conservation Com-
mission on industrial hazardous waste shipments, Atwell con-
cluded that "tank bottoms" have been shipped from refineries 
to a municipal landfill in Sinton, Texas, and that other "Type 
I" municipal landfills throughout Texas have received "tank 
bottoms" and "oily sludge waste," including landfills in Hous-
ton, Conroe, and Altair. While Atwell never identifies un-
leaded gasoline tanks generating UGSTS, she explains that 
standard listing codes preclude specific identification of "un-
leaded gasoline tanks"; generic codes such as "tank bottoms" 
and "oily sludge waste" are employed, and encompass numer-
ous wastes, including those generated by unleaded gasoline 
tanks. Atwell notes that while "Class I industrial, solid 
waste" generally is supposed to be shipped to "a permitted, 
Class I industrial waste landfill rather than a Type I, munici-
pal landfill," exemptions from this rule are routinely granted 
in Texas with respect to those industrial wastes not listed as 
hazardous, such as UGSTS, and the state conservation com-
mission "rarely if ever track[s] the volumes of waste that are 
actually shipped to Type I landfills under these case-by-case 
requests."

 Although the environmental petitioners have identified 
landfills that have a substantial probability of receiving such 
shipments, see LEAN, 172 F.3d at 68, namely, Type I munici-
pal landfills likely to receive wastes within categories that 
include UGSTS, they have failed to establish either a substan-

tial probability that the shipments to these identified landfills 
contain UGSTS, or a link between such deposits and the 
specific harms alleged by their members. See, e.g., Laidlaw, 
120 S. Ct. at 704; Lujan, 504 U.S. at 560-61; LEAN I, 172 
F.3d at 68. As to the former, environmental petitioners do 
not present, for example, either expert opinion that these 
landfills are of a class substantially likely to receive UGSTS-
filled shipments or an affidavit that the effects of UGSTS are 
evident in the landfill's groundwater. As to the latter, by 
failing to connect the alleged injuries to UGSTS, the environ-
mental petitioners also have failed to establish a likelihood 
that the injuries alleged will be redressed by a favorable 
decision. See, e.g., Laidlaw, 120 S. Ct. at 704; Lujan, 504 
U.S. at 560-61.

 Much of the environmental petitioners' standing problem 
arises from the fact that their only affiant who lives in Sinton, 
which Atwell identified as having a landfill likely to receive 
UGSTS waste, has not shown that he was a member of a 
petitioner organization at the time the petition challenging 
the rule was filed, and his affidavit thus is legally insufficient.3 
See Petro-Chem. Processing v. EPA, 866 F.2d 433, 437 (D.C. 
Cir. 1989). The environmental petitioners' other affidavits, 
involving general concerns about pollution at other locations, 
do not cure the deficiency.

 The affidavits of Tommy C. Douglas and H. C. Clark do 
indicate that pollution in the Greens Bayou near Houston may 
be linked to waste from the BFI-McCarty landfill in Houston, 
which Atwell also identifies as among those landfills that 
receive "tank bottoms" and "oil sludge waste," and that 
Douglas no longer canoes in the Bayou as a result of his 
concerns about pollution. The problem lies, however, in the 
vagueness of Clark's and Douglas' affidavits. Clark, a geo-
physicist, states that public records at the Texas Natural 

__________
 3 Herbert H. Coleman's affidavit of August 11, 1999, states that 
he "recently became a member of the Sierra Club," but does not 
indicate that he was a member of the Sierra Club at the time the 
petition was filed. Although API made this point in its brief, the 
environmental petitioners did not submit a responsive affidavit.

Resources Conservation Commission show that contamination 
in the groundwater under and from the BFI landfill in 
Houston, including "petroleum related organic chemicals," 
has migrated into the Greens Bayou. Douglas, a member of 
a petitioner organization who lives in Houston, states that he 
no longer canoes on the Greens Bayou because he and other 
canoers have observed pollution in the Bayou, and because of 
more general concerns about pollution in the Bayou, based in 
part upon his knowledge that "there is a landfill just above 
the location" where he once began a Bayou canoe trip.

 While Clark provides a general link between Houston's 
BFI landfill and the Greens Bayou, and Douglas suggests 
generally that he is wary of Bayou pollution, neither affiant 
traces the pollution of concern to UGSTS waste. Clark 
refers to "petroleum related organic chemicals," but he does 
not suggest the current or imminent presence of specific 
chemicals found in UGSTS waste, such as benzene, and none 
of Clark's statements refer to specific wastes generated from 
unleaded gasoline storage tanks. Similarly, Douglas does not 
describe the characteristics of the pollution that he has 
observed, thus offering no basis to discern whether such 
pollution, and hence his fears, were substantially likely to 
have been derived, even in part, from unleaded gasoline 
storage tanks. Nor does Douglas suggest that his general 
concerns about current or imminent Bayou pollution, includ-
ing his knowledge that a landfill exists nearby, are linked to 
UGSTS waste, or to wastes with features characteristic of 
UGSTS. While it is hardly necessary to present duplicative 
evidence of reasonable fears that are fairly traceable, as 
occurred in Friends of the Earth v. Gaston Copper Recycling 
Corp., 204 F.3d 149, 153, 157-58, 161-62 (4th Cir. 2000) (en 
banc), Douglas and Clark establish little more than that some 
types of petroleum-related organic chemicals migrate from 
BFI's Houston landfill to the Greens Bayou, and that Douglas 
is concerned generally about pollution in the Bayou. This is 
insufficient to establish the environmental petitioners' stand-
ing because there is no showing that the specific EPA listing 
determination that they seek would redress Douglas' con-

cerns. See, e.g., Laidlaw, 120 S. Ct. at 704; Lujan, 504 U.S. 
at 560-61.

 Affiant W. H. Hilton is no more helpful to the environmen-
tal petitioners. He states that he owns property in Wilmer 
and in Ellis County and that municipal landfills "in Texas are 
allowed to accept significant quantities of industrial wastes 
including.... Class 1 wastes [such as UGSTS,] even if the 
[municipal landfill's] permit does not so state," but he does 
not indicate any current or imminent harm to himself. To 
the contrary, he states that he organized a successful effort to 
halt plans for a new municipal waste landfill in Wilmer, and 
that although at one time he was concerned that his Ellis 
County property might be devalued in view of the potential 
expansion of a local municipal landfill and existing groundwa-
ter contamination at that landfill, a political effort resulted in 
a settlement to better protect the groundwater and his prop-
erty. Hilton also states that a Chevron storage tank leaked 
on land adjacent to land belonging to his mother-in-law's 
estate, of which Hilton is co-executor, and that wells had to be 
drilled on the estate's land to remedy the resulting water 
contamination, but Hilton does not identify the circumstances 
surrounding the leak, including whether it involved landfilled 
unleaded gasoline tanks or whether any harms suffered by 
the estate are current or imminent, and hence remediable.4 
See, e.g., Laidlaw, 120 S. Ct. at 704; Lujan, 504 U.S. at 560-
61.

 Therefore, in addition to having failed to show the existence 
or imminent existence of unleaded gasoline storage tanks in 
the identified Type I landfills, the environmental petitioners 

__________
 4 We need not decide the question of executor standing. Al-
though executors are granted standing to sue on behalf of the 
deceased owner of the relevant estate, see, e.g., Nat'l Taxpayers 
Union, Inc. v. United States, 68 F.3d 1428, 1435 (D.C. Cir. 1995); 
Amato v. Wilentz, 952 F.2d 742, 751 (3d Cir. 1991), such standing 
generally is based upon a vicarious, third-party representation 
theory. In the Matter of Oil Spill, 954 F.2d 1279, 1319 (7th Cir. 
1992). Whether such third-party standing could establish associa-
tional standing for an organization of which the third party is a 
member is an open question in this circuit.

fail to trace any harm to their members that flows from the 
presence of UGSTS in waste streams from the landfills, and 
thus to establish that their members' concerns are redressa-
ble through the listings sought by the environmental petition-
ers. Because the environmental petitioners have not demon-
strated an injury to any of their members that is both 
traceable to EPA's non-listing decision and redressable by 
this court, we dismiss the UGSTS portion of their petition for 
lack of jurisdiction. See Laidlaw, 120 S. Ct. at 704; Lujan, 
504 U.S. at 560-61; LEAN I, 172 F.3d at 68.

 B. Coking process exemption: notice and comment claim

 Similar deficiencies exist regarding the environmental peti-
tioners' challenge under the notice and comment requirement 
of the Administrative Procedure Act, 5 U.S.C. s 553(b) & (c), 
to EPA's decision not to regulate the solid wastes inserted 
into the coking process, particularly those used in coke 
quenching.5 EPA exempted from regulation those oil-bearing 
hazardous secondary wastes inserted into the coking process, 
noting in its final rule that such insertion generally occurs 
during coke quenching rather than in the conventional coking 
process. The environmental petitioners challenge this ex-
emption on the ground that EPA failed to provide adequate 
notice and opportunity for comment because EPA focused on 
coke quenching only after the initial notice and comment 
period had closed. We do not address this contention be-
cause the environmental petitioners have failed to establish a 
substantial probability that their affiants will be exposed to 
coke product quenched with hazardous materials. See id.

 The environmental petitioners base their standing to raise 
this contention on the affidavits of Zelda Champion, Frank 

__________
 5 "Coking," the process through which coke is produced, con-
sists of two primary stages. In the first, or conventional coking 
stage, heavy oil bearing feedstocks are placed into a coke drum and 
heated at high temperatures, thus breaking the long-chain hydro-
carbon molecules found in the feedstocks, and ultimately producing 
coke. The second, or "coke quenching" stage, involves the injection 
of water into the coke drum to quench and cool the coke.

Gordon, and Dr. Charles Lamb. The Champion and Gordon 
affidavits show that members of petitioner organizations are 
exposed to coke product generally, including "fines" (i.e., tiny 
coke particles). Both affiants state that they live near refin-
eries or coke storage sites, have observed the storage and 
transportation of coke at such sites, believe that such storage 
and transportation is inadequately controlled, and have wit-
nessed the release and windblown carriage of coke product 
and fines from these sites. They also state that they have 
had such product and fines tested to confirm their identity as 
petroleum coke dust.6 While these affidavits demonstrate 
exposure by members of environmental petitioners' organiza-
tions to coke product and fines, neither Champion or Gordon 
avers that the coke product and fines to which they are 
exposed are generated by a coking process into which hazard-
ous secondary materials are inserted, or are substantially 
likely to be inserted.

 As to the coking process itself, the affidavit of Dr. Charles 
Lamb establishes only that the quenching of coke in waste 
increases the toxic nature of such coke, and that "the dust 
from such coke [would contain] increased levels of toxic 
contaminants." Attached to his affidavit is a report deriving 
estimates of coke contamination levels that would be expected 
from the use of specific refinery wastes in coke quenching. 
Dr. Lamb states that his study showed that "there are 
refinery wastes which contain [polynuclear aromatics] that 
would deposit on the surface of coke particles if they were 
used for coke quenching," and concludes that "[i]t is logical 
that these contaminants would disproportionately partition to 
the finer coke particles ... [and that] coke dust emitted from 
the coke mass would have even higher concentrations of 

__________
 6 It is unclear whether Champion was a member of the Sierra 
Club at the time the petition was filed, and thus eligible to provide 
standing for the environmental petitioners. However, the affidavit 
by Gordon, who was a member of petitioner Citizens for a Better 
Environment when the petition was filed, is in relevant parts 
cumulative of Champion's affidavit except as to the location of the 
facilities each has identified, for Gordon lives in Pittsburgh, Califor-
nia, while Champion lives in Corpus Christi, Texas.

contaminants than indicated previously." But the report 
notes that "[a] site specific risk assessment would require 
actual data of emission rates and ambient air concentra-
tions...."

 In sum, the environmental petitioners' affidavits establish 
at most that the insertion of hazardous wastes into the 
coking process is potentially unhealthy and environmentally 
unsound, and that coke product and fines from such a pro-
cess are likewise unhealthy and environmentally unsound. 
What is missing is an averment that such insertion occurs, or 
is substantially likely to occur, at the facilities that produce 
the coke complained of by affiants Champion or Gordon. It 
is true that Dr. Lamb suggests that there is an economic 
incentive for coke producers to avail themselves of EPA's 
exemption and quench coke in hazardous waste, noting that 
"[w]hile there may be some recovery of fuel values, the 
overriding incentive for using refinery wastes for coke 
quenching is to avoid the cost of waste disposal. The coke 
product can be significantly degraded by waste contaminants 
added in the quenching step." Such a generalized state-
ment, however, is insufficient to demonstrate a substantial 
probability that the specific coke product and fines to which 
members of environmental petitioners' organizations are ex-
posed will be quenched in hazardous waste. While Laidlaw 
may not require very much to constitute a concrete and 
particularized harm, 120 S. Ct. at 706-07, more is required 
than the vague statement proffered here. In Florida Audu-
bon, the court rejected the argument that a tax incentive to 
produce a fuel derived from ethanol was substantially likely 
to generate increased production of ethanol-producing crops, 
given the "lengthy chain of conjecture," and thus to generate 
increased agricultural pollution in the specific areas where 
members of the environmental organization might face harm. 
Florida Audubon, 94 F.3d at 666. While the causal chain in 
Florida Audubon was significantly more attenuated than 
here, Florida Audubon requires some showing of a substan-
tial likelihood that a specific, relevant actor will avail itself of 
a given incentive. Id. at 669. No such showing is made 
here, as nothing is averred to the effect that hazardous 

wastes are present, and hence available to quench coke, at 
the specific facilities identified by affiants Champion and 
Gordon, or otherwise to the effect that hazardous waste 
quenching currently exists or is substantially likely to exist 
in those facilities generating coke product to which members 
of environmental petitioners' organizations are exposed.7 
Consequently, the environmental petitioners have failed to 
link the practices complained of to alleged harms or immi-
nent harms to their members, and thus have failed to estab-
lish that they have standing to raise their coke processing 
exemption claim. Accordingly, we dismiss the coking pro-
cess portion of the environmental petitioners' petition for 
lack of jurisdiction. See Laidlaw, 120 S. Ct. at 704; Lujan, 
504 U.S. at 560-61; LEAN I, 172 F.3d at 68.

 C. Wind-blown Coke Product and Fines

 Finally, the environmental petitioners seek review of EPA's 
decision to defer a listing determination for coke product and 
fines accidentally released into the air, or otherwise inadver-
tently released, from saleable piles of coke. Unlike the 
environmental petitioners' coke quenching challenge, their 
airborne coke product and fines contention does not relate to 
the manner in which coke is processed, or to the materials to 
which the coke is exposed in processing. Rather, this conten-
tion concerns the non-listing of those product and fines 
released from saleable piles of coke, regardless of how the 
coke is processed. As noted in subpart (B), affiants Champi-
on and Gordon establish a link between coke product and 
fines emissions generally, and their exposure to such product 
and fines. Nonetheless, environmental petitioners face an-
other jurisdictional obstacle: the determination they chal-
lenge is a deferral of rulemaking, not a final rule.

__________
 7 In a supplemental filing on April 5, 2000, the environmental 
petitioners repeat that hazardous wastes could, under EPA's rule, 
be inserted into the coking process but do not state that this occurs 
or is substantially likely to occur at a location referred to in their 
affidavits, nor that such information cannot be obtained.

 Under RCRA s 7006(a), the court has jurisdiction to re-
view three types of actions by EPA: promulgation of final 
regulations, promulgation of requirements, and the denial of 
petitions for the promulgation, amendment or repeal of 
RCRA regulations. See American Portland Cement Alliance 
v. EPA, 101 F.3d 772, 775 (D.C. Cir. 1996); 42 U.S.C. 
s 6976(a) (1995). In determining whether an agency has 
taken final action the court has looked to a variety of factors, 
"including the agency's own characterization of its action, 
publication or lack thereof in the Federal Register or Code of 
Federal Regulations, and whether the action has a binding 
effect on the rights of parties, and on the agency's ability to 
exercise discretion in the future." American Portland Ce-
ment, 101 F.3d at 776. A decision by an agency to defer 
taking action is not a final action reviewable by the court. As 
the court explained in concluding that it lacked jurisdiction 
under RCRA to review certain regulatory determinations:

 An announcement of an agency's intent to establish law 
 and policy in future is not the equivalent of the actual 
 promulgation of a final regulation. EPA described in 
 detail the areas that will require further analysis before 
 final regulations can be promulgated, signaling that the 
 Regulatory Determination was not intended as the last 
 word on the subject....
 
American Portland Cement, 101 F.3d at 777 (citation omit-
ted).

 The environmental petitioners acknowledge in their initial 
brief that EPA's failure to list product and fines from coke 
piles is a "deferral" of a listing determination, but contend 
nonetheless that it is reviewable under RCRA because EPA 
lacked discretion to defer this determination under a consent 
decree entered in Browner v. EDF, Civ. No. 89-0598 (D.D.C. 
Dec. 9, 1994). The environmental petitioners' position has 
three shortcomings.8 First, EPA's decision to defer has none 

__________
 8 The environmental petitioners attempted, in their reply brief 
and at oral argument, to recast their position to be that EPA's 
deferral effectively constitutes a final rule insofar as EPA lacked 
discretion to defer ruling under both the Browner consent decree 

of the characteristics of final agency action. In explaining its 
decision on those product and fines inadvertently discarded 
from saleable piles of coke, EPA stated it would "defer" 
making a listing determination because the Browner consent 
decree did not require such a determination and no other 
factors made such a determination immediately necessary. 
Final Rule, 63 Fed. Reg. at 42,161. A decision to defer has 
no binding effect on the parties or on EPA's ability to issue a 
ruling in the future. American Portland Cement, 101 F.3d at 
776.

 Second, to the extent that the environmental petitioners 
challenge EPA's interpretation of the consent decree, this 
court lacks jurisdiction; an action to enforce the consent 
decree must be brought in the district court that issued the 
decree, see 42 U.S.C. s 6972(a); Beckett v. Air Line Pilots 
Ass'n, 995 F.2d 280, 285-86 (D.C. Cir. 1993); Figures v. Bd. 
of Public Utilities of Kansas City, 967 F.2d 357, 361 (10th 
Cir. 1992), even assuming that the environmental petitioners 
have standing to bring such an enforcement action (for the 
Environmental Defense Fund was the sole environmental 
organization in the Browner case).9

 Accordingly, because the court lacks jurisdiction to consid-
er the environmental petitioners' contention regarding EPA's 
decision to defer listing coke product and fines, we dismiss 
that portion of their petition for review as well.

__________
and 42 U.S.C. s 6291(e)(2). Under either characterization, the 
environmental petitioners' contention fails for the same reasons. 
Furthermore, counsel for the environmental petitioners stated at 
oral argument that they are not contending that jurisdiction should 
be taken on the basis of unreasonable agency delay. See Telecom-
munications Research and Action Center v. FCC, 750 F.2d 70, 76 
(D.C. Cir. 1984).

 9 The statute on which the environmental petitioners rely for a 
"congressional mandate" for an EPA listing determination on coke 
product and fines, 42 U.S.C. s 6291(e)(2), underlies the Browner 
consent decree litigation with respect to coke product.